207 Cal.App.2d 818 (1962)
Estate of CHARLES F. TRAUNG, Deceased. WELLS FARGO BANK AMERICAN TRUST COMPANY et al., as Trustees, etc., Petitioners and Appellants,
v.
ROBERT H. BAXTER, as Guardian, etc., Objector and Respondent.
Civ. No. 20105. 
California Court of Appeals. First Dist., Div. One. 
Sept. 26, 1962.
 Philip S. Ehrlich and Irving Rovens for Petitioners and Appellants.
 Samuel C. Shenk for Objector and Respondent.
 SULLIVAN, J.
 We review here an order made by the probate court in the course of its supervision of a testamentary trust by which it has authorized and directed a deviation from the express terms thereof because of a change of circumstances allegedly occurring after the testator's death. The trustees have challenged the propriety of the court's action which requires them to terminate the trust as to one of the beneficiaries and to pay all of his trust estate to his guardian. Appeal has been taken on a partial clerk's transcript. [fn. 1]
 The testator, Charles F. Traung, died in 1940. He left surviving him his wife, Mae Percival Traung, his daughter, Betty Mae Traung, now Betty Mae Schenone, hereafter referred to as Betty and his son, Charles Louis Traung, hereafter referred to as Charles. In his will which was admitted to probate, the decedent created a trust in all of the residue of his estate for the above three persons as principal beneficiaries. In the record before us, we find the terms of the trust set forth in the decree of final distribution entered by the court on July 1, 1941. We summarize such provisions insofar as they are pertinent to this appeal.
 The testator directed his trustees to pay the net income of the trust to his widow for life and upon her death to divide the trust estate into two equal parts, one part to be held for Betty and the other for Charles. He further directed them to pay *822 to Betty and Charles so much of the net income of their respective portions as in said trustees' discretion might be necessary for the proper maintenance, education and support of said children until each of them attained the age of 21 years and until said time to accumulate the balance of the income. Thereafter the trustees were to pay Betty all of the net income of her share for life and to pay Charles all of the net income of his share until the trust was terminated as therein provided. In short, apart from emergencies, [fn. 2] the testator made no provision for distribution of corpus to Betty, although, as we shall hereafter set forth, he did for Charles. It is in connection with the distribution of Charles' portion of the trust that the present controversy arises.
 Distribution of Charles' share of the trust was prescribed in two steps. The trustees were required to pay him one-third of his share, and therefore one-sixth of the entire trust, when he reached the age of 30. As to the second step, the testator's direction was as follows: "Provided, however, that when the said Charles Louis Traung shall attain the age of forty years, if in the judgment of Louis Traung and L. H. Jackson, of Rochester, New York, associated with Stecher Traung Lithograph Corporation, or the survivor of them, he shall have given evidence that he is capable of handling his portion of the trust estate with proper care and judgment, upon the request of Louis Traung and L. H. Jackson, given to the trustees, the trustees then shall terminate the trust as to the remainder of the portion of the trust estate held for the benefit of Charles Louis Traung, and shall pay over and deliver to him his portion of the trust estate. In the event of the death of Louis Traung and L. H. Jackson prior to the termination of the trust, such determination shall be vested in and made by said Wells Fargo Bank & Union Trust Co."
 The will also provided that in the event either Betty or Charles should die prior to the termination of the trust, the share of such person should go to his or her testamentary appointees, or failing such appointees, to his or her issue, or if no issue, to the survivor of said two persons. In the event both Betty and Charles died without having disposed of their respective shares by will and without issue, the trust estate was to go to the heirs of Charles F. Traung, the testator. *823
 Under the will Louis Traung and Wells Fargo Bank and Union Trust Co., subsequently by merger Wells Fargo Bank American Trust Company, were named trustees, and L. H. Jackson, to whom reference has already been made, designated a substitute trustee in the event of Louis Traung's death. Jackson was substituted as trustee in the place of Louis Traung upon the latter's death on November 15, 1949. The trustees were invested with broad powers which we need not detail here.
 In such manner does the will of a successful businessman give expression to his purpose and plan in making provision for the members of his family.
 Mae Percival Traung, the testator's widow and the first life income beneficiary died on August 29, 1960. On that date Charles was over the age of 40 years. He was also incompetent and the Bank of California, Portland, Oregon, was the guardian of his estate.
 On November 18, 1960, the trustees filed their "Nineteenth Report and Account ... and Petition for Instructions." Such document contained the following allegations pertinent to the problem before us: The death of Mrs. Traung and the continued incompetency and disability of Charles; that the trustees proposed to distribute to the Bank of California as guardian of Charles' estate, one-third of Charles' share of the trust or one-sixth of the entire trust, less a specified amount claimed to have been expended for his benefit; [fn. 3] that "L. H. Jackson, individually, [fn. 4] has advised the trustees that in his judgment Charles Louis Traung by reason of his incompetency is not capable of handling the balance of his portion of the trust estate with proper care and judgment and that he accordingly has not requested and will not request the trustees to terminate the trust ..."; and that accordingly the trustees proposed to hold the balance of Charles' share pursuant to the *824 trust rather than distribute it to him, although he had attained the age of 40 years. Among other things, the trustees prayed that the proposed division and distribution of the trust estate be approved by the court.
 The foregoing report, account and petition originally set for hearing on December 2, 1960, was heard by the probate court on January 23, 1961. In the meantime, on January 6, 1961, the probate court appointed Robert H. Baxter, respondent herein, as guardian ad litem of Charles, pursuant to a nomination made by Helen Traung, Charles' wife, and by such order authorized respondent to file objections both to the above-mentioned report and account of the trustees and to a petition theretofore filed by the Bank of California of Portland, Oregon (not in the present record) for authority to remove property of nonresident ward, apparently in contemplation of the distribution proposed by the trustees. Baxter filed such objections forthwith on the day of his appointment.
 Baxter's objections contained the following allegations pertinent here: That Charles was 43 years old and was married; that he and his wife were residents of San Francisco; that because of a second brain operation in 1952, Charles was incapable of managing his own financial affairs and had been rated an incompetent by the Veterans Administration for the purpose of receiving benefits therefrom; that Charles had executed a holographic will prior to his second operation and the will was in the custody of his attorney; that termination of the Oregon guardianship proceedings was contemplated and respondent intended to petition the appropriate Superior Court in California to be appointed guardian of Charles' estate; that, accordingly, no part of Charles' trust estate should be paid to the above Oregon bank; that L. H. Jackson, in exercising his judgment with respect to distribution of the balance of the trust estate, "failed and neglected to consider the true intentions" of the testator as expressed in his will, that the trust provisions were designed "for the protection of the corpus against a son who might be prone to squander said funds" and that if the testator "had any idea" of Charles' future illness and incompetency, he would not have imposed the conditions set forth in the will; that L. H. Jackson neglected to take into consideration the respondent Baxter's competence to handle Charles' estate; that the entire trust estate of Charles, the one-sixth interest proposed to be distributed and the two-sixths interest proposed to be retained by the trustees be ordered distributed to the respondent as guardian *825 ad litem; and that "[t]o acceed [sic] to the requests of each of the banks here involved would cause an undue financial burden to his portion of the trust estate by the assessment of multiple fees and would not be for the best interests of said Charles Louis Traung."
 On January 23, 1961, the probate court also appointed the respondent Baxter guardian ad litem of unborn children of Charles, pursuant to a similar nomination by Charles' wife, Helen, the general purport of the order being to authorize Baxter to file objections similar to, or participate in, those already filed by him as guardian ad litem of Charles. [fn. 5]
 In its order of March 31, 1961, [fn. 6] the probate court found, so far as is pertinent here, that Charles was 43 years old, married, a resident of San Francisco, and "as the result of multiple brain operations, the last of which was in the month of November, 1952, is incompetent and incapable of managing his own financial affairs"; that the respondent Baxter as guardian of his estate was "fully competent, experienced and capable of managing the financial affairs of Charles ... with proper care and judgment"; that the one-sixth of the trust estate payable to Charles at age 30 should be delivered to respondent as his guardian; that the physical condition of Charles was materially different than was the case when the testator executed his will; that "from the provisions of said *826 trust it was clear and within the contemplation and state of mind of the trustor" that Charles should have full benefit of all of his share of the trust at age 40 "conditioned upon the determination that said Trust Estate would be administered with proper care and judgment" and that although Charles was "not personally capable of so administering said estate" the respondent as guardian was so qualified; that to have one-third of Charles' share administered by respondent as guardian and the balance administered by the trustees would serve no useful purpose in preserving the estate, would surcharge it with duplicate fees and expenses and "would be contrary to the intention of the trustor as gathered from the general purpose and scope of the trust provisions"; that L. H. Jackson was on January 23, 1961, informed in open court of respondent's appointment as guardian ad litem of Charles and of the pendency of respondent's petition to be appointed guardian of Charles' estate and that, irrespective of the said notice, the said L. H. Jackson had not altered his position with respect to distributing the balance of the trust estate; and that the refusal of Jackson to request the trustees to distribute the balance of the trust "is not a reasonable exercise of ... [his] judgment ... in the light of all of the circumstances and is an abuse of the degree of discretion" reposed in him, resulting in "an unwarranted division of the Estate" and was contrary to the testator's intention.
 Upon such findings the court ordered the one-third of Charles' share of the trust which was payable to him at age 30 delivered to respondent as his guardian and further ordered and directed the trustees to terminate the trust as it pertained to Charles and in addition to deliver to respondent as guardian the remaining two-thirds of Charles' share. [fn. 7]
 The contention of the trustees here is simply that the condition attached by the testator to the distribution of the balance of the trust estate has not been satisfied. Although appellants thus point at the heart of the problem, they probe no further. At oral argument, counsel for appellants took the position that the legal principles governing deviation from the express *827 terms of a trust because of change of circumstances have no application to the instant case.
 We therefore propose to examine three questions implicit in the issue raised before us: (1) Does the probate court have jurisdiction to authorize or direct a deviation from the terms of the testamentary trust? (2) Was the court justified in directing such a deviation in the instant case? (3) Was the question of such deviation properly cognizable by the court in the proceedings before it?
 [1] We first dispose of a preliminary matter. Appellants claim that "there is not one iota of evidence" to support the finding that Jackson's refusal to request distribution of the balance of the trust estate was unreasonable and in bad faith. Such a claim cannot be considered upon an appeal based solely upon the clerk's transcript. (Seay v. Allen (1955) 134 Cal.App.2d 440 [286 P.2d 392].) [2] Since there is no transcript of the evidence in the record before us, we will, as we must, assume that there was substantial evidence to support the findings. (Crowell v. Braly (1959) 169 Cal.App.2d 352, 354 [337 P.2d 211].) In their closing brief appellants assert that we have before us "all that was presented to the Probate Court" on the present issue. We are at a loss to understand this statement, for the order which appellants have brought before us recites that it was made "after hearing the evidence, and proof having been made. ..."
 We take up the first question. Section 1120 of the Probate Code provides in part that "[w]hen a trust created by a will continues after distribution, the superior court shall not lose jurisdiction of the estate by final distribution, but shall retain jurisdiction for the purpose of determining to whom the property shall pass and be delivered upon final or partial termination of the trust, to the extent that such determination is not concluded by the decree of distribution, of settling the accounts and passing upon the acts of the trustee and for the other purposes hereinafter set forth." [3] Were it not for the foregoing statute the superior court sitting in probate would have no jurisdiction over trusts after rendition of decree of final distribution. (Wells Fargo Bank & Union Trust Co. v. Superior Court (1948) 32 Cal.2d 1, 5 [193 P.2d 721]; Estate of McLellan (1936) 8 Cal.2d 49, 55-56 [63 P.2d 1120].) [4] In employing the powers granted it by the section, the superior court is engaged in the exercise of its special and limited probate jurisdiction as distinguished from its general law and equity jurisdiction. (Estate of McLellan, supra; *828 Estate of Knox (1942) 52 Cal.App.2d 338, 348 [126 P.2d 108].) [5] Nevertheless section 1120 invests the probate court with broad powers over the acts of testamentary trustees and it has been established that the language employed therein "was intended to broaden the jurisdiction of the probate court so as to give that court jurisdiction over practically all controversies which might arise between the trustees and those claiming to be beneficiaries under the trust." (Estate of Smith (1935) 4 Cal.App.2d 548, 552 [41 P.2d 565], quoted with approval in Estate of Smead (1938) 12 Cal.2d 20, 24 [82 P.2d 182] and cited with approval in Wells Fargo Bank & Union Trust Co. v. Superior Court, supra.)
 Does such admittedly broad probate jurisdiction include the power to authorize or direct deviation from the trust provisions? In Estate of Keet (1940) 15 Cal.2d 328, 334 [100 P.2d 1045], the Supreme Court at least assumed the existence of such powers and that under the facts of that case "[i]t would ... have been possible for the trustee, upon a proper showing, to secure permission from the court to deviate from express restrictions against sale." Again, in Estate of Van Deusen (1947) 30 Cal.2d 285, 292-293 [182 P.2d 565], the court assumed, arguendo, that a probate court had the same power under section 1120 as a court of equity to modify a trust on a proper showing of changed conditions. (See generally 1 Nossaman (2d ed.) Trust Administration and Taxation, 35- 08 at p. 669.) In Keyston v. Keyston (1950) 96 Cal.App.2d 550 [215 P.2d 754], the court held that the question whether modification of a testamentary trust should be authorized was one for the sole determination of the probate court. The court based its conclusion on the broad scope of probate jurisdiction conferred by section 1120, relying upon the McLellan, Smith, Smead and Wells Fargo Bank cases (all supra) and upon Estate of Marre (1941) 18 Cal.2d 184, 187 [114 P.2d 586]. We need not examine here the validity of the inclusiveness of such holding, since our present inquiry is whether the probate court has such jurisdiction, irrespective of whether general equity jurisdiction obtains concurrently.
 [6] In our view, the broad jurisdiction of probate courts over testamentary trusts was intended to include the power to modify the trust in proper cases. We find support for such conclusion in the foregoing authorities. Such power, we think, is necessarily incident to the judicial supervision which the section seeks to achieve. Among other things, the statute confers authority upon the court to pass upon the trustee's acts. *829 [7] The probate court must have the power not merely to measure the trustee's acts by the testator's directions but also determine whether the directions should be adhered to inflexibly in all instances. Complete and effectual supervision, we think, results from the court's power to determine, as the court exercising general equity powers does, whether in the light of existing conditions, the primary objectives and dispositive plan of the testator is being subserved or frustrated by his administrative directions. This power is of the essence of the enforcement and administration of trusts. If it is not given full play, judicial supervision is nullified by its own inertia. [8] We hold therefore that the court below had the power under section 1120 to authorize or direct a deviation from the terms of the trust. [fn. 8]
 Was the exercise of this power warranted in the instant case? [9] It is a settled principle of the law of trusts that a court of equity will direct or permit a deviation from the express terms of a trust upon a proper showing of changed conditions occurring after its creation. (Adams v. Cook (1940) 15 Cal.2d 352, 358-360 [101 P.2d 484]; Stanton v. Wells Fargo Bank etc. Co. (1957) 150 Cal.App.2d 763, 770 [310 P.2d 1010]; 49 Cal.Jur.2d, Trusts, 312-316 at pp. 152-156; 2 Scott on Trusts (2d ed. 1956) 167 at pp. 1167-1178; Bogert (2d ed. 1960) Trusts and Trustees, 561, pp. 128-141; Rest. 2d Trusts, 167.)
 The rule is set forth in the Restatement Second of Trusts, section 167, subsection (1) as follows: "The court will direct or permit the trustee to deviate from a term of the trust if owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust; and in such case, if necessary to carry out the purposes of the trust, the court may direct or permit the trustee to do acts which are not authorized or are forbidden by the terms of the trust." Comment b to the above subsection adds a caveat against its indiscriminate application: "The court will not permit or direct the trustee to deviate from the terms of the trust merely because such deviation would be more advantageous to the beneficiaries than a compliance with such direction." *830
 Both Scott and Bogert contain illuminating expositions on the underlying theory of the rule. Scott observes (2 Scott on Trusts (2d ed. 1956) 167 at pp. 1176-1177): "In all these cases the court in conferring power upon the trustee is attempting to prevent the failure or substantial impairment of the purpose for which the settlor created a trust. It is permitting the trustee to do, not what the settlor intended to permit him to do, but what it thinks the settlor would have intended to permit if he had known of or anticipated the circumstances which have happened. ... In so doing the court is not interpreting the terms of the trust, but is permitting a deviation from them in order to carry out the purpose of the trust." Bogert states (Bogert (2d ed. 1960) Trusts and Trustees, 561 at pp. 128-130) that the trust instrument contains two parts "(1) that in which the settlor describes the beneficiaries who are to obtain financial benefits, fixes the size of those benefits, and in many cases states the purposes of the trustor in providing for these benefits; and (2) the portion of the instrument in which the settlor provides for the methods by which the trustee is to employ the trust property in such a way as to secure for the cestuis the intended advantages, as, for example, the retention or sale of the original trust property, the making of new investments, and the time of payments to be made to the beneficiaries." (Emphasis added.) This authority points out that while normally a court of equity will secure the carrying out of both the dispositive provisions and the administrative provisions, occasionally adherence to the latter will render it impossible or extremely difficult for the trustee to carry out the former and that "[i]n this dilemma the courts take a position which seems very reasonable and justifiable. They take the view that where there is a conflict between a dispositive provision and an administrative direction the latter should give way. The primary and fundamental objects of the trustor are to make certain property transfers to the cestuis and thus secure for them certain advantages, as, for example, support in comfort, education, or a life of luxury. The terms of the trust having to do with the manner in which the trustee should act in order to obtain the primary objectives are not on the same level of importance but are rather minor and auxiliary. The jurisdiction of equity to enforce trusts should and does include power to vary the details of administration which the settlor has prescribed in order to secure the more important result, namely, obtaining for the beneficiaries the advantages which the settlor stated he wished them to have." (Pp. 129- 130.) *831
 Thus in Adams v. Cook, supra, 15 Cal.2d 352, 361, a case involving changed conditions subsequently arising in connection with a business trust, it was said: "It is perfectly clear from the above authorities that the rule against courts modifying the terms of a contract, and that they should construe it precisely as the parties had made it, does not apply to declarations of trust, where the primary purpose of the trust would not be accomplished by a strict adherence to the terms of the declaration of trust and that when it is made to appear in a court of equity, as was shown in the present case, that the benefits and advantages which the trustors desired to confer upon the beneficiaries would not accrue to them by 'a slavish adherence to the terms of the trust,' the court may modify the terms of the trust to accomplish the real intent and purpose of the trustors."
 In Stanton v. Wells Fargo Bank etc. Co., supra, 150 Cal.App.2d 763, 770, after referring to a number of authorities, including Scott, Bogert and the above-mentioned section 167 of the Restatement Second of Trusts, Mr. Justice Peters summarized the rule in the following words: "The power to permit deviation from the terms of private trusts is analogous to the cy-pres doctrine applicable to charitable trusts. [Citation.] A few generalizations can be made. Normally, of course, the trust instrument constitutes the measure of the trustee's powers. [Citation.] Except in unusual or emergency situations the courts will limit the trustees to the powers conferred. But the courts will not permit the main purpose of a trust to fail by compelling slavish adherence to the administrative limitations of the trust instrument. Where the main purpose of the trust is threatened the courts will and should grant permission to deviate from restrictive administrative provisions. But the court should not permit a deviation simply because the beneficiaries request it where the main purpose of the trust is not threatened and no emergency exists or is threatened. It must be remembered that it is the theory of this rule that, by the exercise of this power, the court is not defeating the trust, but in fact furthering it. The equity court is simply doing what the testator, presumably, would have done had he anticipated the changed conditions. In other words, the specific intent of the testator is disregarded in order to enforce his general intent."
 [10] The case before us falls within the above rule. The trust provisions show an intent on the part of the testator that Charles should ultimately have full enjoyment of his share *832 of the corpus and not merely the income thereof. It is clear that the testator had in mind a different objective with respect to Charles than for Betty who was to receive only income and no part of the principal apart from that receivable under the emergency clause. Charles, on the other hand, was to receive one-third of his share unconditionally at age 30 and the balance at age 40, subject to the condition heretofore set forth. Thus the trust provisions disclose a general intent that Charles should receive all of his share at the latter age providing it would be managed with proper care and judgment. The trial court found that from the provisions of the trust "it was clear and within the contemplation and state of mind of the trustor" that Charles should have the full benefit of one-half of the trust estate, in other words, all of his share thereof, at age 40 conditioned upon the determination that it "would be administered with proper care and judgment." We agree with this conclusion as to the general purpose and intent of the testator.
 In his conception of such purpose and intent, the testator obviously contemplated a beneficiary who would be sui juris. It was natural for him, therefore, to express his desired condition dealing with the proper care and management of the balance of Charles' share in terms that related to the personal competence and responsibility of such beneficiary. The proviso that "he [i.e., Charles] shall have given evidence that he is capable of handling his portion ..." (emphasis added) must be considered in this context. The testator did not contemplate Charles' incompetency. His will is completely silent on this contingency, although providing for other contingencies, as for example Charles' marriage, issue and failure of issue, testacy and intestacy. As we have pointed out, Charles' incompetency was a condition arising in 1952, 12 years after the testator's death. The trial court found that Charles' physical condition was materially different "than was the case when the will ... was executed," that he was "incompetent and incapable of managing his own financial affairs," that the respondent as guardian of Charles' estate was "fully competent, experienced and capable of managing the financial affairs" of Charles, but that the trustees were advised by L. H. Jackson, the person designated in the will, that since Charles, by reason of such incompetency, was not capable of handling the balance of his share of the trust, Jackson would not request the trustees to distribute it and terminate the trust.
 The trial court therefore found all of the necessary facts upon which it could and did predicate its order directing a *833 deviation from the provisions of the trust relative to final distribution. It is clear that a conflict existed between the primary purpose af the testator and the administrative provisions prescribed by him. To compel, in the words of the Stanton case, "slavish adherence" to the latter would be to defeat the former, which was that Charles should enjoy the balance of the corpus at age 40 provided that it would be managed with proper care and judgment. Appellants make no attack on the court's finding that respondent was fully capable of so managing the trust and no claim that respondent's administration of the guardianship would not be fully and properly supervised by the probate court. Indeed, in the light of these circumstances, to withhold distribution from Charles' guardian would not be merely to thwart the testator's general intent that Charles should have full enjoyment of the balance of his share. On the record before us and in view of Charles' incompetency, it would be to virtually lock up the balance of the corpus in the trustee's vaults for the rest of Charles' life.
 It was therefore within the compass of the rule we have set forth for the court to permit or direct a deviation from the trust provisions dealing with distribution to Charles at age 40 and to permit or direct distribution to his guardian. This subserves rather than defeats the testator's primary purpose. Under the theory of the foregoing rule, it permits the trustees to do, not what the testator intended them to do but what the court thinks the testator would have intended, if he had anticipated the circumstances of Charles' incompetency. (2 Scott on Trusts (2d ed. 1956) 167 at pp. 1176-1177, supra.) If the testator had anticipated Charles' incompetency, he would have presumably provided for Charles' enjoyment of the corpus as well as the income, so long as the corpus was properly managed and protected.
 The court below also appears to have based its order terminating the trust upon a determination that it would serve no useful purpose to have the trustees' administering two-thirds of Charles' share while respondent as Charles' guardian was administering the other third, thus subjecting the trust estate to duplicate fees and expenses "contrary to the intention of the trustor." This undoubtedly would result in a saving to the beneficiary. [11] However, deviation from the terms of a trust is not justified merely because it would be more advantageous to the beneficiary than compliance with the testator's directions or would offer an expedient solution to the *834 problems of managing the beneficiary's property. (Security- First National Bank v. Easter (1934) 136 Cal.App. 691, 697 [29 P.2d 422]; Rest. 2d Trusts, 167, com. b to subsec. 1.) Therefore, while we conclude that deviation in the instant case was justified for the reasons herein given, we cannot include among them the factor of economy which the trial court apparently considered.
 [12] Although a change of circumstances would warrant deviation from the trust provision here involved, appellants did not seek permission from the court below to deviate from it. They took the position in their report and account that since Jackson had advised them that in the latter's judgment Charles was not capable of handling the balance of the trust and that since Jackson "has not requested and will not request the trustees to terminate the trust" as to Charles, they would continue to hold the balance of his share in trust. Such action, or more properly inaction, on appellants' part would not preclude deviation since as the Restatement provides "[t]he court will direct or permit the trustee to deviate from a term of the trust. ..." (Rest. 2d Trusts, 167, subsec. 1; emphasis added.) [13a] Nor do we think that the doctrine of deviation based upon changed circumstances is rendered inoperative in the instant case because the determination of Charles' ability to handle the corpus rested "in the judgment of" L. H. Jackson.
 On this aspect of the problem, it makes little difference whether we consider this power as a discretionary one vested in Jackson who in respect thereto is a virtual trustee or as one vested in the trustees but exercisable only upon the request of Jackson as their consultant. In either case, we find no absolute discretion conferred by the trust instrument. [14] A discretionary power conferred upon a trustee may be controlled by the proper court if not reasonably exercised. (Civ. Code, 2269; Estate of Heard (1951) 107 Cal.App.2d 225, 231 [236 P.2d 810, 27 A.L.R.2d 1313]; Estate of Canfield (1947) 80 Cal.App.2d 443, 450 [181 P.2d 732].) [15] In the latter case it is said: "A trustee exercising discretion abuses it if he exercises it in bad faith or goes beyond the bounds of reasonable judgment. (Restatement, Trusts, 187, Comment e; Bogert, Trusts, 560.) This general proposition is subject to the established exception that where absolute discretion has been conferred, any unsoundness in the trustee's judgment cannot be deemed to be an abuse of discretion. (Civ. Code, 2269; Neel v. Barnard, 24 Cal.2d 406, 417 [150 P.2d 177]; *835 Campbell v. Folsom, 70 Cal.App.2d 309, 313 [160 P.2d 906]; Restatement, Trusts, 187, Comment j; Scott, Trusts, 128.3.) But the basic inquiry, whenever the exercise of a trustee's discretion, absolute or otherwise, is challenged, is always whether the trustee acted in the state of mind contemplated by the trustor. (Restatement, Trusts, 187, Comment j; Scott, Trusts, 187.)" (80 Cal.App.2d at p. 450.)
 The trial court determined that it was the testator's primary purpose and overriding intent to have Charles receive his full share of the corpus so long as it would be managed with proper care and judgment. Charles' incompetency was a change of circumstance clearly not anticipated by the testator, and in the light of it, compliance with the testator's directions that Charles should, in the judgment of Jackson, give evidence of being capable of handling the trust should not be enforced. As has already been demonstrated, to adhere to such direction is to defeat the testator's purpose and intent. Such purpose can be carried out with full protection to the property by distribution to the guardian. The insistence of Jackson that he adhere to the original directions, rather than deviate from them, is not a reasonable exercise of his judgment because it defeats the purpose of the testator. Indeed the court below found that Jackson's refusal to request a termination of the trust was not a reasonable exercise of judgment, was an abuse of discretion and, in apparent paraphrase of the Estate of Canfield (supra) was "contrary to the state of mind contemplated by the trustor." [13b] We conclude that the discretion vested in Jackson did not prevent the application by the court of the rule allowing a deviation from the provisions of the trust under which Jackson exercised his discretion.
 We hold therefore that the probate court was justified in directing such deviation in the instant case and in ordering the trustees to terminate the trust and deliver the balance of the corpus to the respondent. [fn. 9] *836
 [16a] Finally we inquire whether the court's action was proper upon the proceedings pending before it. These were initiated by appellants upon the filing of their report, account and petition for instructions. Appellants did not seek instructions on the question whether they should terminate the trust; as we have explained (see footnote 3, supra) their petition for instructions was directed to another matter not here in dispute. But they did ask for the court's approval of their proposed distribution which was that only one-third of Charles' share should be distributed and the balance retained under the trust. They thus squarely submitted to the probate court which had judicial supervision of this testamentary trust the propriety of their proposal not to terminate the trust.
 Respondent as Charles' guardian ad litem thereupon filed objections to appellants' report, account and petition, the contents of which we summarized at the outset of this opinion. In short, these objections contained allegations that Jackson, in exercising his judgment on the distribution of the balance of the corpus, "failed and neglected to consider the true intentions" of the testator who, if he "had any idea prior to his death of the future illness and incompetency of his son ... would not have imposed the conditions set forth in his said last will. ..." These allegations, together with the other allegations of respondent, including those bearing upon respondent's competence as guardian to manage the trust estate, in our opinion constituted an adequate petition to the probate court invoking the doctrine of deviation based upon changed *837 circumstances and asking in effect that the trustees be directed to deviate from the provisions of the trust and terminate the trust. [17] Although section 1120 of the Probate Code contains an express provision that "[t]he trustee may also petition such court, from time to time, for instructions ...," a beneficiary of a testamentary trust is also entitled to petition the court for instructions to the trustee. (Estate of Munson (1948) 86 Cal.App.2d 67, 70 [194 P.2d 70]; Estate of Van Deusen, supra, 30 Cal.2d 285, 289, where as already noted the court assumed that the probate court had the power to apply the doctrine of deviation based on changed circumstances.) [18] Furthermore, while it also contains express provisions for the presentation of accounts by the trustee, it is established law that the beneficiary can invoke the court's jurisdiction in filing exceptions to the trustee's accounts. (Estate of Prior (1952) 111 Cal.App.2d 464, 472 [244 P.2d 697].)
 [16b] Respondent's objections, including such petition, and his prayer for an order "[a]uthorizing and directing" distribution to respondent as guardian of all of Charles' share of the trust, properly invoked the jurisdiction of the probate court to direct deviation from the provisions of the trust, to distribute the balance of Charles' share, and to terminate the trust as to him.
 The attempted appeal from the designated portions of the memorandum opinion of the court made and entered on March 2, 1961 (there being no minute order made on said date) is dismissed. The Order Modifying Nineteenth Report and Account of the Trustees of the Trust Created by the Will of Charles F. Traung and Dispositions of Petitions and Objections Interposed Thereto given and made on March 31, 1961, is affirmed.
 Bray, P. J., concurred.
 DRAPER, J. [fn. *]
 I dissent.
 To reach its result, the majority must hold that a man formally adjudged an incompetent in two states is nonetheless "capable of handling his portion of the trust estate with proper care and judgment." Moreover, it must hold that this is so clear that the contrary conclusion of cotrustee Jackson, in whom the will vests the power of determination, is arbitrary and unreasonable. As an incident, it is also necessary *838 to overlook the provision of the will that termination of the trust shall be made "upon the request of" Jackson, who, far from initiating this procedure, has consistently opposed it and continues to do so. Moreover, insofar as the majority suggests that competency of a guardian of the beneficiary is an adequate substitute for the capability of the beneficiary which the testator desired, it holds that a guardian who is not shown even to have been known to the testator is to be substituted as custodian of this rather substantial estate for the trustees who are named in the will, and in whom the testator presumably had a substantial degree of confidence. To me, that result seems a complete rewriting of the will and a total frustration of the testator's intent.
 A principal, if not the sole, purpose of the trust appears from its terms to have been the imposition of limitations upon distribution of the corpus to the testator's two children. Whatever may be our view of the wisdom or desirability of such restrictions, the majority does not suggest that they were beyond the power of the testator.
 The three texts upon which the majority relies permit deviation from the terms of the trust only when "compliance would defeat or substantially impair the accomplishment of the purposes of the trust," and only when "necessary to carry out the purposes of the trust" (Rest. 2d Trusts, 167[1]; and see like statements in 2 Scott on Trusts (2d ed.) 1167, 1176). Bogert distinguishes between "dispositive" and "administrative" provisions, and suggests limitation of the power of deviation to the latter (Bogert, Trusts and Trustees (2d ed.) 128-130). In the present will, there is a notable absence of any emphasis upon, or even declaration of, purposes to be served or standards to be reached by dispositions to the two children. Rather, the emphasis appears to be upon restricting disposition of the corpus. Thus the deviation from terms of the will accepted by the majority effects, in my view, a frustration rather than an accomplishment of the basic purpose of the testator.
 Moreover, the present order may well invade the rights of residuary beneficiaries of the trust. The identity of such residuary beneficiaries is not now determinable. Among those presently likely to participate in such ultimate succession are minors. Unborn children may be entitled to portions of the residue. Yet to direct immediate distribution of the substantial portion of corpus here involved ignores the rights of such possible residuary beneficiaries. Protection of their rights is *839 essential (Estate of Van Deusen, 30 Cal.2d 285, 292-294 [182 P.2d 565]). Courts have no power to benefit one beneficiary at the expense of others (2 Scott, supra, p. 1176; Bogert, supra, p. 152). The majority opinion appears to me to ignore this rule.
 I would reverse the order.
 *Formerly Rules on Appeal, rule 2(b).
NOTES
[fn. 1] 1. The appeal is taken from designated portions of the "Memorandum Opinion and Minute Order made and entered ... on March 2, 1961," and of "the written order made ... on March 31, 1961." The record shows a "Memorandum Opinion" on March 2, 1961, but no minute order. The memorandum opinion is not in form or substance a minute order and the attempted appeal therefrom must be dismissed. We review the proceedings on the appeal from designated portion of the written order entitled "Order Modifying Nineteenth Report and Account of the Trustees of the Trust Created by the Will of Charles F. Traung and Disposition of Petitions and Objections Interposed Thereto." (Cal. Rules of Court, rule 2(b).*)
[fn. 2] 2. By the usual emergency clause, the testator authorized the trustees in their discretion to use or apply for any beneficiary such part of the principal of the trust estate as they might consider suitable or necessary in specified emergencies providing that no more than 10 percent of the principal was so used in any one year.
[fn. 3] 3. This was the distribution directed to be made to Charles and hence mandatory at age 30. The petition alleged that the trustees desired instruction as to whether they could charge expenditures made for Charles' benefit against his interest in the trust estate. In its order of March 31, 1961, the probate court determined that the amount of the expenditures was chargeable against the entire trust estate and was not properly chargeable against Charles' share alone. No appeal has been taken from such portion of the court's order.
[fn. 4] 4. This capacity of Mr. Jackson should be noted. As already pointed out, he and Louis Traung, as consultants but not as trustees, were given the power to recommend distribution to Charles at age 40. After the death of Louis Traung in 1949, Mr. Jackson remained the sole consultant and also became individual trustee in Traung's place.
[fn. 5] 5. The petition for appointment of guardian ad litem, filed January 23, 1961, alleges that Charles "has no issue of his body, but, for the purposes of appearing herein and for the protection of any estate which any such children may have should the same be born in the future to said Charles Louis Traung, petitioner desires to so participate with respect to the objections heretofore filed" by petitioner as guardian ad litem of Charles Louis Traung.
[fn. 6] 6. The order recites the filing of objections to the trustees' report and account and to the Bank of California's petition by respondent as guardian ad litem of the unborn children of Charles. The record before us contains none. In the light of the relevant order of appointment, discussed above, we assume respondent as such guardian ad litem participated in or adopted the objections theretofore filed by him as guardian ad litem of Charles. The order of March 31, 1961, recites the filing of similar objections by Betty Schenone for herself and as guardian ad litem of her children and any afterborn children. These objections and the pertinent proceedings for appointment of guardian ad litem are not in the record. Nor does the record contain any of the proceedings dealing with respondent's appointment as general guardian. The record does show that at the hearing the trustees appeared in person (the corporate trustee by representative) and by counsel, that the Bank of California of Portland, Oregon appeared by counsel, that respondent in his capacities as guardian ad litem of both Charles and the unborn children of Charles appeared in person and by counsel, and that Betty Schenone individually and as guardian ad litem appeared by counsel.
[fn. 7] 7. The order stated that Jackson's instruction to the trustees not to distribute the remaining two-thirds "is not consistent with the state of mind or intention of the ... [testator] when viewed in the light of all existing circumstances; is not a reasonable exercise of judgment by the said L. H. Jackson under all of the circumstances and is tantamount to bad faith" on his part. The order also denied the petition of the Bank of California and the petition of Betty Schenone individually and as guardian ad litem. The record does not disclose the nature or purpose of the latter petition.
[fn. 8] 8. Further evidence of the court's power is found in the 1959 amendment to section 1120 (Stats. 1959, ch. 864, p. 2899, 1) which impliedly permits the court to authorize the exercise by the trustee of powers not conferred on him by the trust.
[fn. 9] 9. Appellants assert no claim of error predicated upon the effect of the trial court's order on alternate beneficiaries. None of the other parties appearing before the trial court have appealed. In the absence of a transcript of the evidence, the record presented on appeal does not fully disclose what proceedings were had below with respect to alternate beneficiaries of Charles' share. The first class of such beneficiaries, Charles' testamentary appointees, are not identified at all, although the record shows that Charles had executed a holographic will. Nor does the record show what action respondent took as guardian ad litem of Charles' unborn children. If representation of alternate beneficiaries was essential, respondent's representation of such wards would have to be real and not merely formal and would not include any power vested in him to consent to acts hostile and adverse to the interests of his wards. (Leonardini v. Wells Fargo Bank etc. Co., infra.) We express no approval of respondent's appearing as guardian ad litem of Charles and also as guardian ad litem of Charles' unborn children. Where the rights of residuary beneficiaries may be adversely affected, modification of a trust may not be in all instances permissible unless such rights are protected (Estate of Van Deusen, supra, 30 Cal.2d 285, 292) or unless all of the beneficiaries adversely affected consent. (Leonardini v. Wells Fargo Bank etc. Co. (1955) 131 Cal.App.2d 9, 13 [280 P.2d 81, 49 A.L.R.2d 1085].) The record does not indicate that the court's order was based on the consent of other beneficiaries. In our view, the instant case is distinguishable from those (e.g., Van Deusen, supra; Leonardini, supra) where through modification one beneficiary attempts to invade the corpus at the expense of another or attempts to accelerate a remainder interest. Here no invasion or acceleration is involved. The facts justified deviation from an administrative provision. If the consultant Jackson had voluntarily recognized this and requested the trustees to distribute, contingent beneficiaries could have no complaint. If the court, rather than Jackson, ordered distribution upon the latter's failure to do so, found by the court to be an abuse of discretion, alternate beneficiaries can still have no complaint.
[fn. *] *. Assigned by Chairman of Judicial Council.