73 Cal.App.3d 515 (1977)
140 Cal. Rptr. 795
Estate of ELSINORE MACHRIS GILLILAND, Deceased.
UNION BANK, as Co-trustee, etc., et al., Petitioners and Respondents,
v.
AMERICAN HEART ASSOCIATION et al., Objectors and Appellants.
Docket No. 47692.
Court of Appeals of California, Second District, Division Two.
September 21, 1977.
*519 COUNSEL
Poindexter & Doutre, Bruce S. Ross, William M. Poindexter, Simon & Sheridan, Lee T. Dicker, Meserve, Mumper & Hughes and Peter A. Menjou for Objectors and Appellants.
Larwill & Wolfe, Charles W. Wolfe, Ball, Hunt, Hart, Brown & Baerwitz, Joseph A. Ball and Laurence F. Jay for Petitioners and Respondents.
OPINION
FLEMING, J.
For the fourth time an appellate court is called upon to resolve a dispute concerning the Gilliland Testamentary Trust (the Trust),[1] established under the will of Elsinore Machris Gilliland, who died 12 January 1967. The Trust, funded on 31 October 1967 with assets appraised at $16,500,000, generates gross annual income in excess of $900,000. The will directs the trustees to pay out of net income $25,000 a year to each of five nieces and nephews of Mrs. Gilliland (the annuitants), a total of $125,000, and on the death of each annuitant (with one exception) to pay the same sum on a representational basis to the annuitant's issue. The remainder of the trust income is payable equally to six named charities, which also will share equally in the corpus of the trust on the death of the last eligible annuitant.
The current controversy between the testamentary trustees (respondents) and four of the charities (Charities) presents the issue whether the trustees acted legally and prudently in deferring collection of certain promissory notes payable to the trust by Sky Harbor Ranchos and Estates (Sky Harbor), a closely held California land development corporation. After a lengthy trial the court made findings of fact and orders  which approved the trustees' fifth account current and the deferred portions of the prior fourth account current; which granted the trustees' petition for instructions (Prob. Code, § 1120), thereby authorizing the trustees to continue collection of the Trust's Sky Harbor notes as funds became available to Sky Harbor in the regular course of business and to refrain from dissolving the corporation; and which denied Charities' petition to surcharge the trustees, remove trustees, and secure punitive damages. Charities appeal, contending that Sky Harbor notes *520 have been extended beyond five years from Gilliland's death in contravention of the provisions of the trust; that the method used to collect the notes is an abuse of the trustees' discretion; and that co-trustee Essig's position as both co-trustee of the Trust and salaried officer and minority shareholder of Sky Harbor constitutes an impermissible conflict of interest which justifies his removal and the removal of the remaining co-trustee (Union Bank).
Sky Harbor's indebtedness to the Trust arose as follows: in the 1950's Gilliland, her nephew Norman Essig (respondent co-trustee) and John Haskell formed a land development venture in Yucca Valley, high desert land in San Bernardino County. Gilliland provided funds for the purchase of some 1240 acres of land, and the parties created Sky Harbor as a closely held corporation to subdivide, manage, and sell the land. Profits were to be divided approximately equally. Stock ownership in Sky Harbor was divided 41.6 percent each to Essig and Haskell and 16.8 percent to Gilliland. To finance Sky Harbor's development activities, Gilliland between 1959 and 1962 made loans to Sky Harbor totalling $670,000 and represented by 23 promissory notes due 15 April 1969 and carrying interest at 4 1/2 percent (except one 5 percent and one 6 percent note). Sky Harbor made no payments of principal or interest on the notes prior to Gilliland's death on 12 January 1967, at which time the indebtedness amounted to $867,000. In her will Gilliland made provision for the collection of Sky Harbor notes as follows:

"ARTICLE VIII
"I declare that I have purchased 1520 acres of land in Sections 6, 7, 17 and 19, Township 1 South, Range 6 East, S.B.B. & M., San Bernardino County, California. I have entered into a business enterprise with John E. Haskell and Norman Essig, by which 1280 acres located in said Sections 7 and 17 are to be subdivided and the profits shared approximately equally between the three of us. For tax purposes, a corporation, called Sky Harbor Ranchos and Estates, has been formed to do the subdividing. I have loaned said corporation varying sums of money for development and operational purposes, and have also loaned monies to said John E. Haskell and Norman J. Essig for their acquisition of stock in said corporation. The corporation has exercised its options to purchase approximately 696.5 acres of said land, and has the option to purchase the remainder in said Sections 7 and 17.
*521 "I have great confidence in this venture. I hereby authorize and direct my Executors and Trustees to give reasonable extensions of time to said corporation, and also to said John E. Haskell and Norman J. Essig, to pay the aforesaid obligations, but not to exceed Five [5] years from the date of my death. I also authorize and direct my said Executors and Trustees to loan said corporation such sums of money as may reasonably be required by it to complete any development and sale of said 696.5 acres, and to acquire, subdivide and sell all of the remainder of said land, upon the same terms and conditions as are set forth in the Subdivision Trusts presently set up with Security Title Insurance Company, of San Bernardino, California, said loans to be secured by proceeds from the sale of lots and to be for a reasonable period of time, but not to exceed Five [5] years from the date of my death."
At its initial funding the Trust received the notes of Sky Harbor and 16.8 percent of Sky Harbor's stock. Thereafter as the result of a settlement with Haskell (not relevant here) the Trust acquired his 41.6 percent of the stock, so that it now owns a majority interest of 58.4 percent in Sky Harbor, while Essig continues to own the remaining 41.6 percent. Since the start of the joint venture with Gilliland, Essig has been, and still is, chief executive officer of Sky Harbor; he takes care of sales and purchases, engages in public relations work intended to prevent buyers' defaults on installment land sale contracts, and draws an annual salary of $18,000 a year, supplemented on two occasions by $20,000 bonuses. Sky Harbor has paid no dividends.
The Sky Harbor notes fell due on 15 April 1969. Thereafter, in accordance with the terms of the will as carried forward in the decree of distribution establishing the Trust, the trustees extended the notes, and Sky Harbor agreed to pay higher interest rates of 7 to 8 percent. During the extension period Sky Harbor paid current interest as it accrued but paid nothing on principal or back interest. Under the terms of the will the authorized extension period terminated on 12 January 1972, five years after the date of Gilliland's death.
At the time the notes became due in 1972 Sky Harbor had insufficient funds on hand to pay its total indebtedness, in that the debt amounted to $985,000 and Sky Harbor had only $156,000 in readily available funds. The trustees canvassed the possibility of liquidating Sky Harbor and distributing its assets (land sale contracts and unsold lots) to the Trust in payment of the debt, but, on advice of tax counsel and Sky Harbor's accountant, they rejected that alternative because of possible unfavorable *522 federal income tax consequences on liquidation, including collapsible corporation problems under Internal Revenue Code section 341, acceleration of deferred tax liability problems under Internal Revenue Code section 453(d), and unrelated business income problems under Internal Revenue Code section 681. Because the terms of the will did not permit any formal extension of the notes, the trustees decided to follow a policy of collecting the notes as rapidly as possible from any and all surplus funds coming into the hands of Sky Harbor until such time as all lots were disposed of and enough gain realized to obviate potential income tax problems. In reaching their decision the trustees relied heavily on a detailed accounting projection prepared for the Trust by the accounting firm of Cutler, Moore and Linford. The projection indicated that the stockholders of Sky Harbor would get maximum benefit from their investment by allowing the corporation to continue in existence until 1 January 1985, and that the earliest possible date to effect liquidation with sufficient funds to pay the resulting taxes would be 1 January 1975. The report took into account as major interrelated factors: (1) the benefit in early liquidation that interest earned on land sale contracts would be tax free when paid to the Trust; (2) the detriment in early liquidation that costs of collection on land sale contracts would not be useful tax deductions for the Trust since it would be paying no taxes; (3) the detriment in early liquidation that recognition of deferred income might require payment of income taxes at surtax rates. The report also noted that if liquidation were to be effected by 1 January 1975, it would be necessary to suspend all payments to the Trust during 1973 and 1974.
Through the period of the fifth account the trustees collected roughly $346,000 in principal, plus interest, and by 31 October 1973 Sky Harbor's total indebtedness to the Trust had been reduced to $522,000. On that date the book value of the Trust's 58.4 percent equity interest in Sky Harbor was $323,000, and the face value of Sky Harbor's receivables, principally land sale installment contracts, was $1,576,000.[2] Pursuant to stipulation of the parties to this litigation Sky Harbor agreed to pay 10 percent interest on its indebtedness until paid in full. On 31 October 1974, according to a supplement to the fifth account current, total indebtedness had been reduced to $472,000. By 1 December 1974, total indebtedness was down to $361,000.
Charities objected to the fourth and fifth accounts of the trustees, contending that deferred collection of the notes without any procurement *523 of security therefor was an impermissible "extension" of the notes prohibited by the will. They argue that since Sky Harbor had insufficient moneys to pay the notes, it should have assigned its land sale contracts to the Trust in payment thereof. To discharge its debt Sky Harbor had been willing to assign land sale contracts to the Trust at face value with right of recourse, but Charities had claimed that the face value of the land sale contracts should be discounted to their current market value. (There was testimony that discounts of 30 to 50 percent are customary in land sale contracts). The difficulty with this suggestion, according to tax counsel, was that satisfaction of the debt with discounted contracts might well have accelerated the corporation's deferred tax liability and resulted in liability in excess of $300,000 at a time Sky Harbor had less than $40,000 cash on hand. Furthermore, the Trust would have been required to enter the real estate business to promote and collect the land sale contracts thus obtained.[3]
The trial judge found that the Trustees had neither extended the notes nor violated any fiduciary duties; that they had not abused their discretion; that the Trustees had engaged in a reasonable and prudent course of collection of the notes. The court approved and settled both the fourth and fifth accounts, and instructed the Trustees "to continue to collect the debts of Sky Harbor Ranchos and Estates, a California corporation, to said Trust by applying to said debts all of the corporation's funds available after operating expenses and taxes, and to refrain from causing the dissolution of said corporation at this time." The court disposed of the claim of conflict of interest by stating that the testatrix had known of Essig's dual role when she named him as co-executor and co-trustee; that because Essig's interest in Sky Harbor as stockholder and employee had been created with her full knowledge and consent prior to her death, and because her will recited her intention that he should share *524 in the profits of the corporation and also serve as co-trustee, no grounds existed for his removal.
1. (1a) The first question is whether the trustees' collection methods constituted an extension of the Sky Harbor notes in violation of testatrix' will, and if so, whether such a deviation was permissible. (2) Since there is no conflicting extrinsic evidence of testatrix' intent, this court, on the basis of documents and uncontradicted testimony, must reach an independent judgment on her intent as expressed in her will. (Estate of Dodge (1971) 6 Cal.3d 311, 318 [98 Cal. Rptr. 801, 491 P.2d 385]; Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865-866 [44 Cal. Rptr. 767, 402 P.2d 839].) (3a) In the law of bills and notes the term "extension" has an accepted formal meaning and refers to an agreement between creditor and debtor, enforceable by the debtor, that payment of the debt be postponed. (1b) The facts here do not present such an extension, because there was neither a formal written agreement nor an executed oral agreement of indefinite extension, but merely a unilateral decision by the trustees to collect the notes as rapidly as possible without insisting on immediate payment in full. (3b) A creditor's willingness to wait a reasonable time to see whether a debtor's repayment schedule will succeed and a creditor's acceptance of part payment during that time does not amount to a formal extension of a debt. (Pacific Finance Corp. v. Crane (1955) 131 Cal. App.2d 399, 407 [280 P.2d 502]; see also, Woolwine v. Storrs (1905) 148 Cal. 7, 11 [82 P. 434].) (1c) Extension is a question of fact; mere forbearance to enforce payment is not the equivalent of extension. (Ravano v. Sayre (1933) 135 Cal. App. 60, 63 [26 P.2d 515].) It is therefore clear that no formal extension was granted.
Yet it is possible that decedent in her will did not use the word "extension" in a technical sense. Charities argue that when she forbade extensions more than five years after her death, she meant to direct the trustees to collect the notes in full by that date. However, we think it more probable that in this carefully drawn, attorney-prepared will the term extension was used in a formal legal sense and not as a shorthand direction to trustees to collect the notes within five years of her death. If she had intended the latter result, it would have been easy for her to direct the trustees to collect the notes in full by that date, rather than merely direct them not to extend the notes further. Both the uncontradicted evidence and the provisions of the will indicate a relationship of mutual trust and confidence between Gilliland and Essig, one of the *525 named trustees; and the administrative provisions of the Trust vest great discretion in the trustees.[4] The circumstances suggest that the testatrix intended to preserve flexibility for the trustees in collecting the notes from Sky Harbor, even though she did establish a cut-off date for formal extensions. Accordingly, because there is no evidence that the term extension in this attorney-drawn will was used in anything other than its formal sense, because the trustees' conduct did not amount to an extension of the notes, and because the evidence supports a finding that the testatrix did not intend to require immediate collection when the notes became due and payable, we find no deviation from the express terms of the will.[5]
*526 2. (4a) The next question is whether the collection methods used by the trustees to deal with Sky Harbor's notes constituted an abuse of discretion. In general, it is axiomatic that trustees invested with management powers of the sort given here, possess broad discretion in the conduct of the trust's business affairs. (5) It is also axiomatic that the trial court possesses great discretion in assessing the quality of particular trust management and that it takes a strong showing on appeal to overturn a trial court's finding that trustees have acted reasonably and prudently in managing their trust. (4b) In collecting Sky Harbor's notes the trustees refrained from requiring Sky Harbor to liquidate, refrained from requiring it to borrow money to pay off its overdue notes, and refrained from requiring it to assign land sale contracts to the Trust to pay off its notes. Instead, the trustees adopted a policy of collecting the notes out of Sky Harbor's cash surplus as it became available. Expert testimony was presented to the trial court on the tax consequences to Sky Harbor of liquidation in 1972 or shortly thereafter, from which could be inferred the possibility of substantial income tax liability on Sky Harbor's as yet unrealized gain under its deferred-payment land sale contracts. According to the experts, even though the proceeds of the sales might ultimately be destined for charity, profits might still be taxed in the hands of Sky Harbor as ordinary income, a result particularly undesirable in that these profits existed only on paper, payments under the contracts had yet to be collected, and cash on hand might be insufficient to pay possible accelerated taxes. The trial court was reminded that the Trust was a 58.4 percent equitable owner of Sky Harbor and had an interest in not weakening Sky Harbor's financial ability to weather unexpected adversity by overloading it with debt. The court was also reminded that the trustees, as majority stockholders, owed a fiduciary duty to Essig, the minority stockholder, not to push the corporation unnecessarily hard and thereby weaken its ability to survive. (See Jones v. H.F. Ahmanson & Co. (1969) 1 Cal.3d 93, 108-109 [81 Cal. Rptr. 592, 460 P.2d 464]; Thrasher v. Thrasher (1972) 27 Cal. App.3d 23, 26-27 [103 Cal. Rptr. 618, 56 A.L.R.3d 204].) From such testimony, the trial court concluded that liquidation in 1972 would have been a potential "disaster" for Sky Harbor, and therefore, a fortiori, for the Trust as its majority stockholder.
We do not accept this testimony at full face value but look on it as a type of special pleading used to justify the course of conduct actually followed by the trustees. Evidence suggests it might have been possible for Sky Harbor to borrow elsewhere in order to pay off its overdue notes to the Trust, and evidence also suggests that the trustees should have *527 acted more vigorously to obtain security for the amounts owed by Sky Harbor on notes which became overdue in January 1972. The merits and feasibility of alternative methods of collection would possess great relevancy if the Trust had suffered actual losses as a result of the method of collection followed by the trustees. However, the fact of the matter is that the risks inherent in the trustees' method of collection never materialized, and no losses were incurred that could form the basis for surcharge against the trustees for having adopted an imprudent method of collection. We, therefore, view these alternatives as might-have-beens that are of no immediate consequence to the present litigation.
The single deficiency for which the trustees could be faulted involves the rates of interest at which these debts were carried, in that the rates appear to be lower than those that would have resulted from arms-length dealings between borrower and lender. But this deficiency, if it existed in fact, has been remedied by action of the litigants themselves, perhaps as a consequence of pressure generated by the initiation of this and other lawsuits against the trustees.
The factual situation before us is thus one that, as we now know, did not result in actual loss but which contained risks of loss that may or may not have been unacceptably high, principally the possibility that Sky Harbor might have incurred substantial liabilities that would have jeopardized collection by the Trust of its unsecured, overdue notes. But there are risks in any course of action, and we cannot say as a matter of law that a prudent trustee would necessarily have embarked on a different course of collection. (6) The case law on a trustee's discretion to forebear collection of a debt indicates that failure to collect in full by the due date does not necessarily amount to an abuse of the trustee's discretion. (Estate of Schandoney (1901) 133 Cal. 387, 393 [65 P. 877]; In re Moore (1892) 96 Cal. 522, 525 [31 P. 584]; cf. In re Cater's Estate (1951) 6 N.J. 426 [78 A.2d 904].) (4c) Not so clear is the propriety of a trustee's failure to obtain security for an overdue debt when security is possible. But the question is factual; and in some cases indulgence to a debtor may be the prudent course for the creditor. (In re Moore, supra, 96 Cal. 522, 525.) At bench, substantial evidence in the form of expert testimony supports the trial court's finding that the trustees' course of conduct fell within their discretion, and we affirm the judgment even though we ourselves might have formed a different opinion on the degree of prudence exercised.
*528 3. (7a) Finally, we reach the question of conflict of interest and removal of the trustees. (8) When the settlor of a trust has named a trustee, fully aware of possible conflicts inherent in his appointment, only rarely will the court remove that trustee, and it will never remove him for potential conflict of interest but only for demonstrated abuse of power detrimental to the trust. (See Estate of Bixby (1961) 55 Cal.2d 819, 826 [13 Cal. Rptr. 411, 362 P.2d 43]; Estate of Brown (1937) 22 Cal. App.2d 480, 485-488 [71 P.2d 345]; Estate of Wemyss (1975) 49 Cal. App.3d 53, 61 [122 Cal. Rptr. 134]; Estate of Keyston (1951) 102 Cal. App.2d 223, 228-229 [227 P.2d 17].) (7b) In Estate of Brown, supra, the court said that the settlor's named trustee will be removed only for extreme grounds, such as incapacity, dishonesty, or lack of the qualifications necessary to administer the trust. (P. 486.) In Estate of Keyston, supra, the court declined to remove the trustee, even though the entire corpus of the trust was closely-held stock in a corporation of which the trustee was shareholder and salaried president; the decedent trustor, said the court, was aware of this conflict, and no actual dishonesty was alleged. So here. No actual dishonesty or obvious abuse exists; the conflict consists of relationships known to the settlor and expressly sanctioned by her. The trial court acted correctly in refusing to remove the trustees.
The judgments and orders are affirmed.
Roth, P.J., and Beach, J., concurred.
A petition for a rehearing was denied October 19, 1977.
NOTES
[1] Estate of Gilliland (1969) 276 Cal. App.2d 258 [80 Cal. Rptr. 876]; Estate of Gilliland (1971) 5 Cal.3d 56 [95 Cal. Rptr. 343, 485 P.2d 543]; Estate of Gilliland (1974) 44 Cal. App.3d 32 [118 Cal. Rptr. 447].
[2] These were installment land sale contracts securing payment of the purchase prices of lots sold. Purchasers paid 10 to 15 percent down and executed notes for the balance.
[3] Installment contracts of the type held by Sky Harbor are less valuable to a stranger than to the developer, because the developer possesses the practicable option of repossession and resale of the lots that secure the contracts. To protect his security the holder of such paper must position himself to conduct a real estate business. Accordingly, the orderly collection of the paper by Sky Harbor and its continued servicing of the land sale contracts performed a valuable function that served to maximize return to both the shareholders and the Trust. For these reasons the trustees did not consider it advisable to liquidate Sky Harbor or assign its paper to an outside entity or to the Trust, especially after the Trust began to collect 10 percent interest on its notes.

Charities also proposed to the trustees that the debt be satisfied with contracts on which Sky Harbor had already paid income taxes, with respect to which acceleration under Internal Revenue Code section 453(d) presented no problem. Yet in the view of the trustees the problem of collection of the paper persisted, as did the possibility of an audit on tax-deferred paper.
[4] See, for example, the following provisions:

"ARTICLE V
"To carry out the purposes of the Trust hereinbefore established in Article IV hereof, the Trustees are vested with the following powers, in addition to those now or hereafter conferred by law, affecting the Trust or the Trust Estate:
".....................
"2. To hold any property and operate any property or business received in the Trust so long as the Trustees may deem advisable, at the risk of the Trust Estate and not at the risk of the Trustees, carrying adequate insurance at the expense of the Trust Estate against both contractual and tort liability.
"3. To manage, control, sell, convey, exchange, partition, divide, subdivide, improve, alter and repair, real or personal property; to grant options and to sell upon deferred payments; to lease for terms within or extending beyond the duration of the Trust, for any purpose, including exploration for and removal of gas, oil and other minerals; to create and release restrictions, easements and other servitudes.
".....................
"7. To invest principal in such bonds, mortgages, trust deeds, debentures, preferred or common stocks, or other property, real or personal, as the Trustees may deem advisable, whether or not authorized by law for investment of trust funds, except that the Trustees shall exercise the judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital....
".....................
"12. To determine what is principal or income of the Trust Estate and to apportion and allocate, in their discretion, receipts and expenses as between these accounts.
".....................
"20. Unless specifically limited, all discretions conferred upon the Trustees shall be absolute and their exercise conclusive on all persons interested in this Trust. The enumeration of certain powers of the Trustees shall not limit their general powers, the Trustees being vested with and having all the rights, powers and privileges which an absolute owner of the same property would have."
[5] Charities correctly contend that deviation from the express terms of a trust is only permissible when conditions arise which were not known to the settlor, were not contemplated by him in the instrument of trust, and are of such a nature that compliance with the express terms of the trust would defeat or substantially impair its principal purposes. (E.g., Estate of Traung (1962) 207 Cal. App.2d 818, 828, 829, 831 [24 Cal. Rptr. 872]; Estate of Gilliland (1974) 44 Cal. App.3d 32, 37 [118 Cal. Rptr. 447].) Thus, a showing of possible severe tax losses would be a doubtful justification to deviate from a settlor's expressed intention to require trustees to collect a debt in full by a specified date.