Filed 4/23/15  Hughes v. Klein C1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ALEXANDER REYNOLDS HUGHES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CONRAD LEE KLEIN et al.,<br><br>        Defendants and Appellants. | A138983<br><br>    (Los Angeles County<br>      Super. Ct. No. BP063500)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>NO CHANGE IN JUDGMENT** |

**THE COURT:**

It is ordered that the opinion filed herein on March 30, 2015, be modified as follows:  On page 15, footnote 18 is replaced with the following, so the footnote now reads:

[18]     According to appellants, the value of Tower Grove has continued to increase and, as of the close of evidence, the LLCs had received a legitimate offer of $60 million for their secured interest in the property, which amount "would reflect an annual return on the LLCs' actual monetary investment in Tower Grove of over 7%."

The Petition for Rehearing filed April 13, 2015 is denied.

There is no change in the judgment.


DATE:                                                       _____
                                                                          McGuiness, P. J.

Filed 3/30/15 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ALEXANDER REYNOLDS HUGHES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CONRAD LEE KLEIN et al.,<br><br>    Defendants and Appellants. | A138983<br><br>(Los Angeles County<br> Super. Ct. No. BP063500) |

This is an appeal from an order to immediately suspend and remove Conrad Lee Klein, Jack Reynolds and Christopher Pair (collectively, appellants) as Co-Trustees of the Mark Hughes Family Trust (Trust). Appellants contend the trial court committed several errors in imposing this order, including applying the wrong legal standard and otherwise abusing its discretion in finding they committed gross negligence when handling a significant trust asset known as the Tower Grove property. Appellants further contend the trial court erred when rejecting their affirmative defense of consent. For reasons set forth below, we affirm the trial court's order.

1

# FACTUAL AND PROCEDURAL BACKGROUND[1]

Mark R. Hughes (Mark) died in 2000, leaving a substantial estate derived from Herbalife International (Herbalife), the corporation he personally formed and built (the Estate).[2] At the time of Mark's death, the Estate was worth over $300 million, the bulk of which was placed in the Trust. His son, respondent Alexander Reynolds Hughes (Alexander), was born in 1991 and is the sole non-contingent beneficiary of the Trust, as well as the primary beneficiary of the Estate. According to Mark's instructions, the principal is to remain in the Trust until Alexander reaches age 35.

Mark originally named himself sole Trustee and Alexander's mother, Suzan Hughes (Suzan or Guardian), as Successor Trustee upon his death. After the couple divorced, however, Mark named as Successor Trustees upon his death appellants Jack Reynolds, Alexander's grandfather and chairperson of Herbalife's board of directors; Conrad Klein, an Herbalife senior executive and director; and Christopher Pair, a friend since childhood and Herbalife's chief executive officer until resigning in 2001. Mark also named appellants as Co-Executors under his will. Separately, Mark established a custodianship on behalf of Alexander, of which Reynolds served as custodian until his resignation in 2006 (Custodianship).

Based upon Mark's plan, most of the Trust assets were held by limited liability companies (LLCs) owned by the Trust. Soon after assuming the role of Co-Trustees, appellants named Klein as Manager of these Trust-owned LLCs.[3] Appellants also named Klein as lead, full-time Trustee.

Almost immediately upon Mark's death, legal disputes arose among appellants, Suzan, and others involved with Mark's Estate and Trust. To name just a few examples,

---

[1] Matters relating to the Estate of Mark R. Hughes have been before this court several times in the past. For this reason, and for the sake of judicial efficiency, we set forth only those facts relevant to the issues raised in the present appeal. A more complete history of these proceedings may be obtained from one or more of our prior opinions. (See, e.g., *Estate of Mark R. Hughes*, 2006 Cal.App.Unpub. LEXIS 8275 (Sept. 20, 2006; nonpub.); *Klein v. Hughes* (2005) 133 Cal.App.4th 121.)

[2] Herbalife was sold in 2002.

[3] Klein had been identified in the LLC agreements as a candidate to succeed Mark as LLC Manager upon his death.

2

Suzan, acting as Guardian of the Estate, sued appellants in 2001 in their capacity as Executors, alleging that they had been grossly negligent in approving certain creditors' claims against the Estate, including three such claims submitted by Herbalife. This litigation resulted in a $200,000, plus interest, surcharge imposed against appellants, a decision we subsequently affirmed on appeal. (*Estate of Mark R. Hughes*, *supra*, 2006 Cal.App.Unpub. LEXIS 8275.) In addition, in 2001 and again in 2004, when Alexander was still a minor, Suzan unsuccessfully petitioned the court on his behalf to remove appellants as Trustees. The 2001 petition was decided against Suzan on summary judgment, a ruling we affirmed on appeal. (*Hughes v. Klein*, 2004 Cal.App.Unpub. LEXIS 9683 (Oct. 25, 2004). The 2004 petition, in turn, appears to have become moot in 2009, before trial was held, when Alexander reached age 18.

This present appeal, in turn, was brought by Alexander on his own behalf, having reached the age of maturity in 2009. Specifically, Alexander filed a petition on December 15, 2010 seeking to suspend and remove appellants in their capacities of Trustees based upon the following alleged acts and omissions: (1) mismanaging the investment of Trust assets; (2) acting with gross negligence and without candor in connection with the so-called Graegin transaction and proposed Zacadia litigation settlement[4]; (3) committing a breach of trust by failing to fund the Custodianship; (4) committing a breach of trust by failing to support Alexander; (5) acting with gross negligence in connection with the so-called Tower Grove real property sale; (6) exhibiting excessive hostility toward Alexander; and (7) paying themselves and their agents excessive compensation. In addition, Alexander argued more generally that appellants had engaged in an ongoing pattern of concealing material information, misleading the court and other parties, and otherwise acting dishonestly in their role of Trustees.

On March 18, 2013, following a lengthy trial that included testimony from appellants, Alexander, and other key players, the trial court issued a 44-page minute

---

[4]    As the trial court recognized, the matter of the legality of the Graegin transaction was finally adjudicated in an earlier lawsuit.

order.[5]  Under this order, the trial court decided to remove all three appellants as Trustees.  In a separate order, the court also ordered appellants' immediate suspension.

As this minute order reflects, the trial court identified one situation in particular that warranted appellants' immediate suspension and removal – to wit, appellants' acts and omissions in connection with the sale of Tower Grove, a 157-acre parcel of previously undeveloped real property located on a ridgeline in Beverly Hills.  The trial court's minute order also noted other acts of misconduct by appellants in connection with their Trust-related activities, including their failure to properly fund the Custodianship.  However, the court ultimately did not find these acts worthy of appellants' removal or suspension.  With respect to Alexander's remaining claims, the trial court likewise found no basis for ordering appellants' suspension or removal.

On April 12, 2013, the trial court issued a final order, expressly based on "the findings set forth in the court's minute order," removing appellants as trustees and appointing Fiduciary Trust International of California as interim successor trustee.  The court also set a status conference to address the issue of appointing and confirming permanent successor trustee(s).  Appellants did not request, and the trial court did not prepare, a statement of decision.  Nor was the lengthy minute order formally incorporated into the final order.  Appellants did, however, file a timely notice of appeal on May 14, 2013.

## DISCUSSION

Appellants raise four related arguments on appeal.  First, appellants contend the removal order must be reversed because the trial court applied the wrong legal standard when determining whether grounds exist for their removal.  Second, appellants argue for reversal on the ground that the undisputed evidence does not support a finding that they committed gross negligence.  Alternatively, appellants contend the trial court abused its discretion in ordering their removal for arbitrary and unreasonable reasons.  And, finally,

---

[5]    Before trial, the court dismissed Alexander's related claims seeking to remove Klein as LLC Manager and to bar Reynolds as a candidate to succeed Klein as LLC Manager after concluding it lacked jurisdiction over the LLCs.  This decision has not been appealed.

4

appellants argue reversal of the order is required because a consent agreement exists among the parties that bars Alexander's breach-of-trust claim as a matter of law and undisputed fact. We address each argument in turn below after a brief discussion of the relevant law.

As mentioned above, Mark, the sole trustee when the Trust was formed, specifically appointed Klein, Pair and Reynolds as Successor Trustees upon his death. Generally, a heightened standard governs a court's decision to remove a trustee, at least where the factors triggering the petition for removal were recognized or recognizable at the time of the trustee's designation: " 'When the settlor of a trust has named a trustee, fully aware of possible conflicts inherent in his appointment, only rarely will the court remove that trustee, and it will never remove him for potential conflict of interest but only for demonstrated abuse of power detrimental to the trust. [Citations.] . . . .' [Citation.]" (*Copley v. Copley* (1981) 126 Cal.App.3d 248, 286-287; see also *Estate of Bixby* (1961) 55 Cal.2d 819, 826 ["court[s] will not ordinarily remove a trustee appointed by the creator of the trust"]; *Estate of Gilliland* (1977) 73 Cal.App.3d 515, 528 [where the settlor appoints a particular individual as trustee, removal is appropriate only "for extreme grounds, such as incapacity, dishonesty, or lack of the qualifications necessary to administer the trust"].) As courts have long-recognized: "No man is infallible; the wisest makes mistakes; but the law holds no executor responsible for the consequences of his mistakes which are the result of the imperfection of human judgment and do not proceed from fraud, gross carelessness, or indifference to duty." (*Estate of Buchman* (1954) 123 Cal.App.2d 546, 556.)

On appeal, we must remain cognizant that "[w]hether a trustee should be removed . . . is a matter within the sound discretion of the trial court and is ' " 'dependent upon the circumstances of each particular case.' " ' " (*Estate of Keyston* (1951) 102 Cal.App.2d 223, 228; see also *Estate of Gilmaker* (1962) 57 Cal.2d 627, 633. See also Rest.2d Trusts, § 107, p. 235 [the court has reasonable discretion to remove a trustee "if his continuing to act as trustee would be detrimental to the interests of the beneficiary"].) Where, however, "the trial court's ruling is based on assertedly improper criteria or

5

incorrect legal assumptions, we review those questions de novo." (*Hypertouch, Inc. v. Superior Court* (2005) 128 Cal.App.4th 1527, 1537; accord *City of Marina v. Board of Trustees of the California State University* (2006) 39 Cal.4th 341, 355 ["In the context of review for abuse of discretion, . . . 'use of an erroneous legal standard constitutes a failure to proceed in a manner required by law' "].)  The trial court's factual findings, in turn, are reviewed for substantial evidence.  (*Khani v. Ford Motor Co*. (2013) 215 Cal.App.4th 916, 920.)

**I.      Did the trial court apply the appropriate legal standard for removal?**

Appellants' first argument is that the trial court's suspension and removal order must be reversed because the court relied upon the wrong statute – to wit, Probate Code section 16040, subdivision (a), instead of Probate Code section 16052, subdivision (a).[6] Alexander responds that, whether section 16052, subdivision (a) or section 16040, subdivision (a) controls, the trial court's exercise of discretion in ordering appellants' suspension and removal was proper and well-supported by evidence.  (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 269 ["we will affirm a judgment correct on any legal basis, even if that basis was not invoked by the trial court. [Citation.] There can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct"].) We agree with Alexander.

As an initial matter, it is not entirely clear which statute the trial court relied upon in finding grounds for appellants' suspension and removal for breach of fiduciary duty in connection with the Tower Grove sale.  Indeed, the trial court refers alternatively to both statutes at different points in its minute order.  And, as Alexander notes, there is no statement of decision; nor was one requested by appellants.  Under these circumstances, we decline to find reversible error based on purported faulty legal reasoning:  "A formal statement of decision enables a reviewing court to determine what law the trial court employed. A failure to request a statement of decision results in a waiver of findings and conclusions necessary to support the judgment and we will accordingly infer such

---

6       Unless otherwise stated, all statutory citations herein are to the Probate Code.

6

conclusions." (*Shaw v. County of Santa Cruz, supra,* 170 Cal.App.4th at p. 269.) Instead, we assume the correctness of the trial court's reasoning and "indulge all legitimate and reasonable inferences to uphold the judgment." (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 50.)

In any event, despite the parties' legal posturing, the basic legal framework for removing a trustee does not appear to be in dispute. "California statutes authorize . . . removing a trustee (Prob. Code, § 17200, subds. (a)(8), (10)), and give the court power to make decrees and take other necessary action to dispose of matters presented by the [removal] petition. (Former Prob. Code, § 1138.2, now Prob. Code, § 17206.)" (*Getty v. Getty* (1988) 205 Cal.App.3d 134, 140.) In particular, a trustee may be removed for committing any breach of trust (§ 15642, subd. (b)(1)), which, broadly speaking, is "[a] violation by the trustee of any duty that the trustee owes the beneficiary." (§ 16400.) Of significance here, one fundamental duty a trustee owes its beneficiary is "to take reasonable steps under the circumstances to take and keep control of and to preserve the trust property." (§ 16006; see Rest.2d Trusts, § 176, com. b, p. 381 ["It is the duty of the trustee to use reasonable care to protect the trust property from loss or damage"].)

The trustee's general standard of care when administering the trust is set forth in section 16040, subdivision (a): "The trustee shall administer the trust with reasonable care, skill, and caution under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of like character and with like aims to accomplish the purposes of the trust as determined from the trust instrument." Similarly, the Trust instrument in this case provides: "When investing, reinvesting, purchasing, acquiring, exchanging, selling and managing the trust property, the Trustee shall act with the care, skill, prudence and diligence under the circumstances then prevailing . . . that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." (Trust, Art. 8.1.6.)

7

Our legislature has prescribed a different statutory rule, however, where, as here, the authority to manage a particular trust asset has been delegated to someone other than the trustee. Under such circumstances, section 16052 provides in relevant part: "(a) A trustee may delegate investment and management functions as prudent under the circumstances. The trustee shall exercise prudence in the following:

"(1) Selecting an agent.

"(2) Establishing the scope and terms of the delegation, consistent with the purposes and terms of the trust.

"(3) Periodically reviewing the agent's overall performance and compliance with the terms of the delegation.

"(b) In performing a delegated function, an agent has a duty to exercise reasonable care to comply with the terms of the delegation.

"(c) Except as otherwise provided in Section 16401, a trustee who complies with the requirements of subdivision (a) is not liable to the beneficiaries or to the trust for the decisions or actions of the agent to whom the function was delegated." (§ 16052, subds. (a)-(c). See also § 16040, subd. (c) ["This section does not apply to investment and management functions governed by the Uniform Prudent Investor Act, Article 2.5 (commencing with Section 16045)"].)

Here, as previously stated, the trial court found appellants failed to act with reasonable prudence, and thereby violated their fiduciary duties to the Trust beneficiaries, in connection with the Tower Grove sale. Tower Grove, recall, is a 157-acre parcel of real property on a Beverly Hills ridgeline that Mark purchased for $8 million two years before his death. This property, undeveloped when Mark acquired it, was held by one of the Trust-owned LLCs and represented one of the Trust's most significant assets. Indeed, as the trial court pointed out, appellant Pair described Tower Grove as "the most significant non-liquid asset of the Trust."

Around 2003, appellants decided it was time to either develop or sell Tower Grove. The Trust considered several options for developing or selling the property

8

before it was ultimately offered to Charles Dickens, an Atlanta-based businessman.[7] Initially, Dickens was granted a lease on the property with an all-cash option to buy and a mandate to secure tract map approval.[8] In the end, however, Dickens was extended a no-cash deal for Tower Grove due to his inability to provide the down payment.[9] Then, after years of breaching the terms of this no-cash deal despite additional extensions of credit from the Trust, Dickens was ultimately forced to file for bankruptcy.

The trial court quite aptly summarized the pertinent details of the Tower Grove sale as follows:

"The Trust-owned LLC sold Tower Grove to a buyer [Charles Dickens] for $23,750,000 with absolutely no money down; the Trust-owned LLC financed the entire transaction. The Trust-owned LLC received a security interest in the property representing the full sales price."

"[Dickens] was someone with whom the Co-Trustees had a relationship as they had previous business dealings with him related to Tower Grove. The Co-Trustees were familiar with his past performance. [¶] . . . [¶]

"According to Mr. Klein, Mr. Dickens was of 'limited financial resources.' A 'poor man.' His company had no assets.

"Mr. Dickens had no formal education in real estate, property management, real estate financing, and no professional licenses or certifications. He had very little experience in real property development and no prior experience in entitlement work or the recordation of a tract map.

"Mr. Dickens was also in breach of a lease entered into with the Trust-owned LLC dated January 8, 2004. (Exhibit 599) (The lease between Mr. Dickens and the Trust-owned LLC was part of the overall sales transaction.) Mr. Dickens breached many of the lease

---

[7]     The decision to sell Tower Grove followed the trial court's denial of appellants' petition for approval of their own plan to develop the property.

[8]     For the sake of convenience, our references to "Dickens" include both the person and his corporate interests, including Tower Park Properties and Tower Park Development Company LLC, the entities involved in the Tower Grove transactions.

[9]     According to appellants, the $23,750,000 sale price for this no-cash deal was almost 20 percent higher than any prior offer they had received at the time, justifying their decision to support it.

terms: the obligation to pay rent (albeit $1 per month), payment of impositions (Mr. Dickens did not know what the term meant), payment of insurance premiums, the payment of property taxes (during the lease term), and the funding of an $850,000 development account (in fact no such account was opened)."[10]

As the trial court thus recognized, the Trust itself did not actually own or sell Tower Grove. Rather, it was an asset owned and sold by one of the Trust-owned LLCs, MH Holdings IIH, LLC. Further, pursuant to the Trust instrument, appellants were authorized to (and did) "employ . . . agents" to manage the Trust-owned LLCs "as the Trustee . . . deem[ed] necessary for the best interest of the trust estate . . . ." The Trust instrument expressly states that "the Trustee shall not be responsible for the acts of such person . . . beyond the obligation to use reasonable care in the selection of such . . . agents."[11] (Trust, Art. 8.1.24.)

Consistent with these Trust provisions, the Trust-owned LLC agreements provided in relevant part that a manager shall manage and control the LLC's business and affairs rather than the trustees: "[T]he Manager shall have full, complete and exclusive authority, power and discretion to manage and control the business, property and affairs of the [LLC], to make all decisions regarding those matters, to supervise, direct and control the actions of the officers . . . ." Relevant here, as mentioned above, appellant Klein was named Manager of the Trust-owned LLC with ownership interest in the Tower Grove property.

Appellants rely upon this Trust-sanctioned broad delegation of authority to Klein to manage and control the business of the Trust-owned LLC to argue that they cannot be held in breach of any duty of trust or care arising from decisions made by Klein during

---

[10]    Appellants do not challenge any of these facts for purposes of this appeal.

[11]    Section 16401 delineates six circumstances where a trustee may be held liable to the trust beneficiary for an act of its agent: (1) the trustee directs the agent's act; (2) the trustee delegates to the agent the authority to perform an act that the trustee is under a duty not to delegate; (3) the trustee fails to use reasonable prudence in selecting the agent or retaining the agent selected by the trustee; (4) the trustee fails to periodically review the agent's overall performance and compliance with the terms of the delegation; (5) the trustee conceals the agent's act; or (6) the trustee fails to take reasonable steps to compel the agent to redress the wrong in a case where the trustee knows of the agent's acts or omissions. (§ 16401, subd. (b).) Section 16000 provides, however, that "On acceptance of the trust, the trustee has a duty to administer the trust according to the trust instrument and, *except to the extent the trust instrument provides otherwise*, according to this division."

the course of the LLC's sale of Tower Grove to Dickens.  For reasons explained below, and in light of the circumstances at hand, we disagree with appellants' argument.

First, as the trial court noted, the Trust-owned LLC agreements empowered the appellants, in their capacities as Trustees, to remove the Manager "at any time for any reason upon Approval by the Members."  In so providing, the agreements imposed a quite significant check on Klein's otherwise broad authority to control the LLCs' affairs, including the LLC's sale of Tower Grove to Dickens.

Further, this power vested in the appellants, to remove the Manager must be viewed in light of the even more fundamental duty owed by the appellants, to their beneficiaries – namely, to preserve the Trust's assets by, among other things, preventing unnecessary loss or damage.  (§ 16006; see Rest.2d Trusts, § 176, p. 381.)  As such, the mere fact that power to control the business and affairs of the Trust-owned LLCs (including those related to Tower Grove) was delegated exclusively to the Manager does not mean all powers vested in the appellants, were delegated to the Manager or otherwise excused or surrendered.  We know of nothing in the statutory framework, the Trust instrument, or the LLC agreements that provides as much.  To the contrary, reservation of power in the hands of the appellants, to remove the Manager *for any reason at any time* suggests quite the opposite.

Thus, we are left with a more factual question – to wit, whether appellants committed a breach of trust by failing to exercise reasonable prudence in monitoring Klein's overall performance as LLC Manager so as to permit proper assessment of whether his removal or some other act of intervention was warranted to prevent loss or damage to Trust assets in connection with the Tower Grove sale.[12]  (See *Getty v. Getty, supra*, 205 Cal.App.3d at pp. 139-140 ["The purpose of removing a trustee is not to inflict a penalty for past action, but to preserve the trust assets. [Citation.] " 'The question

_____

[12] Contrary to appellants' contention, the trial court correctly identified the pertinent legal issue:  "The [appellants'] duty to preserve assets included an obligation to appropriately oversee an LLC manager of a Trust-owner LLC in an effort to prevent loss or damage.  That supervision would necessarily include ensuring that the management of the Trust-owned LLC assets was consistent with the purposes of the Trust and in the best interests of the beneficiaries and taking appropriate corrective action with the LLC Manager when necessary."

11

in each case is whether the circumstances are such that the continuance of the trustee in office would be detrimental to the trust . . . ' (2 Scott on Trusts (4th ed. 1987) The Trustee, § 107, p. 104.)"]. Accord, § 16052, subd. (a) ["The trustee shall exercise prudence in the following: [¶] . . . [¶] Periodically reviewing the agent's overall performance and compliance with the terms of the delegation"]; Trust, Art. 8.1.6.) To this question, we now turn.

## II. Does the evidence support the trial court's suspension/removal order?

The trial court found that appellants' conduct with respect to the Tower Grove sale (and development) constituted "a gross breach of trust" that "borders on recklessness." The court also found this breach "resulted in significant damage to the Trust . . . ." Several factors are identified in the trial court's minute order in support of these findings.

First, the trial court noted that appellants had engaged in previous business dealings with Dickens, Tower's buyer, and thus knew that he had "limited financial resources"; no formal education, licenses or certifications in the areas of real estate or property management; and little, if any, prior experience in real property development, entitlement work or tract map recordation.[13]

Second, the court also pointed out that appellants knew Dickens was in breach of the lease he had entered into with the Trust-owned LLC on January 8, 2004, before the deal to sell him the property with no cash down was consummated. Specifically, they knew Dickens had failed to comply with lease terms requiring payment of monthly rent, property taxes, insurance, and "impositions" (a term Dickens did not know), and requiring funding of an $850,000 development account (which Dickens never opened). Nonetheless, under Klein's management, the Trust-owned LLC continued to extend loans to Dickens in connection with Tower Grove's development. For example, one of the Trust-owned LLCs provided Dickens an unsecured, no-guaranty loan in the amount of $1.5 million for the purpose of ensuring the property's tract map would be recorded. Dickens was later granted an extension on this loan when he failed to repay it in a timely

---

[13] Appellants maintained, nonetheless, that Mr. Dickens had an impressive work ethic.

12

fashion. In addition, a Trust-owned LLC then extended an additional $12 million in credit to Dickens for the purpose of building infrastructure and paying property taxes, among other things. This loan, secured by a deed of trust, was also extended despite Dickens' failure to make the required payments. Ultimately, however, the LLCs issued notices of default on this loan due to Dickens' continued failure to make required payments.

In light of appellants' awareness of these and other facts, and in light of the significant value that Tower Grove held for the Trust,[14] the trial court concluded appellants had a duty to act in their oversight capacity to ensure the financial soundness of the Tower Grove sale, and, in addition, to ensure Dickens complied with the terms of the sale once it was executed by, for example, making the requisite payments as they became due. (§ 16052, subd. (a).) Further, the trial court concluded that, once it became clear to a reasonably prudent person that the Tower Grove sale was or had become financially unsound, appellants had a duty to take steps to preserve the Trust's assets by opposing the sale, removing Klein as Manager under the terms of the Trust-owned LLC agreement, or taking some other measure designed to prevent further loss or damage. (See § 16052, subd. (a); *Getty v. Getty, supra*, 205 Cal.App.3d at pp. 139-140.) In other words, had appellants acted in a reasonably prudent manner, they would not have sat idly by, essentially doing nothing, while the Tower Grove sale was consummated and, thereafter, while Dickens repeatedly failed to abide by its bargained-for terms. Yet, according to the trial court, that is exactly what happened.[15]

Having reviewed the relevant record, we conclude there is indeed substantial evidence to support the findings relied upon by the trial court to suspend and remove appellants based on their conduct in connection with the Tower Grove sale. In short, the

---

[14] The record reflects Tower Grove was worth about $23,750,000.00 at the time of sale.

[15] The trial court acknowledged that appellant Pair and his counsel "voiced [their] concerns" about the sale. One email, in particular, from Pair's attorney to Klein's attorney stated: "I still do not understand why [Klein] is so in favor of this and it appears he is now placing himself in a position as Manager to go ahead with developing the property, although there does not appear to be any additional benefit to the Trust from what would have been the sale to Tower Park Properties LLC." However, as the trial court also acknowledged, Pair and his counsel "took no effective action." Appellant Reynolds, in turn, "actively avoided overseeing the issues with the Tower Grove sale. Mr. Reynolds deferred to Mr. Klein on most everything. (Exhibits 609 and 884)."

trial court appropriately identified evidence of a multitude of acts or failures to act committed by appellants in connection with the Tower Grove sale that, viewed collectively, met the legal standard for removal. These acts and omissions include, but are not limited to, appellants' failure to assess whether the sale was financially sound, their failure to investigate Dickens' creditworthiness or business competence, their failure to intervene when the Manager granted multiple extensions to Dickens with respect to his loan payments or provided him additional loans to finance the Tower Grove project, and more generally, their failure to actively monitor or oversee issues arising from the Tower Grove sale that would have raised significant red flags for a reasonably prudent fiduciary.[16] The end result of these failures was, thus, that title to the Trust's most valuable non-liquid asset was passed to Dickens, an individual who never paid any money whatsoever to the Trust or the Trust-owned LLC for the Tower Grove property and ultimately filed for bankruptcy protection in federal court, costing the Trust an estimated $2 million to $3 million in legal fees.[17] Under these circumstances, we agree with Alexander that the trial court's suspension/removal order was a reasonable exercise of discretion.

In reaching this conclusion, we accept appellants' assertions that the LLC's interest in Tower Grove was at all relevant times over-secured, and that Tower Grove's value increased significantly due to Dickens' development efforts (including his finalization of the property's tract map and building of infrastructure).[18] However, these facts, even if undisputed, are not dispositive. As stated above, we review a trial court's suspension or removal order for abuse of discretion and its factual findings for substantial

[16] Klein even agreed to extend another line of credit for $7 million after Dickens initiated bankruptcy proceedings. In doing so, he explained that his goal was to enable Dickens to perform further infrastructure work in order to attract potential investors for Tower Grove, which would, in turn, facilitate his emergence from bankruptcy so that the LLCs could hopefully recoup their investment.

[17] The Trust-owned LLCs were also subsequently named in adversary proceedings subsequently brought by the debtor. These proceedings have been dismissed without prejudice. Apparently, the parties have engaged in settlement negotiations that include the possibility of reducing the loan balances owed by Dickens to the Trust in exchange for certain releases. It is unclear to the court whether any settlement agreement has been finalized.

[18] According to appellants, the value of Tower Grove has continued to increase since its sale to Dickens and, as of the close of evidence, Dickens had received a legitimate offer of $60 million for the property, which amount "would reflect an annual return on the LLCs' actual monetary investment in Tower Grove of over 7%."

14

evidence.  (*Estate of Gilmaker, supra,* 57 Cal.2d at p. 633; Rest.2d Trusts, § 107, p. 235 [the court has reasonable discretion to remove a trustee "if his continuing to act as trustee would be detrimental to the interests of the beneficiary"].)  And, for all the reasons just identified, we conclude there is substantial evidence in this record supporting the trial court's reasonable decision to suspend and remove appellants to prevent further detriment to the Trust in light of their numerous inexcusable failures of oversight.

Moreover, we also acknowledge appellants' contention that the trial court erred by focusing on Tower Grove without considering the Trust's *overall investment performance* or the Manager's *overall performance*.  Appellants note that Tower Grove, when sold, constituted less than seven percent of the LLCs' assets, and that the overall Trust portfolio had performed well.[19]  While perhaps true, however, appellants do not, and could not, seriously dispute the fact that Tower Grove, a 157-acre parcel of real property on a Beverly Hills ridgeline, represented a significant asset in the Trust's portfolio.  Indeed, as the trial court pointed out, Pair himself described Tower Grove as "the most significant non-liquid asset of the Trust."  Further, as reflected in the applicable statutory framework, court authority to remove a trustee for breach of fiduciary duty does not hinge upon the extent, or even the existence, of monetary loss to the trust arising from the breach; rather, the decision to remove a trustee to preserve trust assets is a matter left to the court's sound discretion in light of the particular circumstances at hand.[20]  (*Estate of Keyston, supra,* 102 Cal.App.2d at p. 228; *Estate of Gilmaker, supra,* 57 Cal.2d at p. 633. See also Rest.2d Trusts, § 107, p. 235 [the court has reasonable discretion to remove a trustee "if his continuing to act as trustee would be detrimental to the interests of the beneficiary"].)  Accordingly, we reject appellants' fact-based challenge to the trial court's exercise of discretion.

---

[19]     As appellants point out, the trial court rejected for insufficiency of the evidence Alexander's removal request based upon poor performance of the Trust portfolio as a whole.

[20]     While monetary loss is not a prerequisite to court removal of a trustee (§ 15642), in this case, the trial court found significant monetary loss in the form of "several millions of dollars" in legal fees "incurred by the Co-Trustees in defending their actions connected to Tower Grove, both in this court and the Bankruptcy court."  This, of course, provides further evidence in support of the trial court's decision to suspend and remove appellants for their breach of fiduciary duty.  (*Getty v. Getty, supra*, 205 Cal.App.3d at pp. 139-140.)

15

**III. Did the trial court err in rejecting appellants' consent defense?**

Finally, appellants seek reversal of the order for their suspension and removal based upon the purported written consent to the Tower Grove sale by Suzan, Alexander's mother and guardian. They reason that, because Suzan consented to the sale, Alexander should be equitably estopped from challenging it as a breach of trust.

Below, the trial court rejected this argument, primarily on the ground that Suzan did not consent in writing to the actual transaction that took place – to wit, the "100 percent seller financed no money down sale" of Tower Grove to Dickens. Rather, she consented to "the transactions . . . as reflected in the documents enclosed with Kenneth A. Ziskin's memorandum to Hillel Chodos[, Suzan's attorney,] dated January 8, 2004." The transactions in the referenced documents, in turn, reflect an all-cash sale that never transpired. As such, the court found appellants' reliance upon Suzan's consent misplaced. This is particularly true, the court found, given that Suzan lacked certain material facts when offering her "consent" to the Tower Grove sale, including the key fact that the Trust-owned LLC intended to finance the entire sale.

We conclude the trial court's rejection of appellants' consent defense was entirely reasonable on this record. Documentary evidence admitted at trial reflects that, on January 8, 2004, Kenneth Ziskin, counsel for the Trust-owned LLCs, wrote a memorandum to Suzan's attorney, Hillel Chodos, enclosing a consent form for Suzan's signature and twelve documents regarding the proposed sale of Tower Grove. This memorandum stated: "I submit these documents to you in order to obtain the consent of Suzan Hughes *to the transactions reflected therein . . . .*" (Italics added.) "[T]he documents," as appellants admit, "reflect an all-cash deal," rather than the seller-financed deal that was ultimately executed.[21]

Further, on January 9, 2004, the day after Suzan received Ziskin's memorandum with the enclosed documents, she executed on behalf of Alexander a written "Consent of

---

[21] More specifically, as Dickens testified, the deal reflected in the documents given to Suzan's attorney required $23.75 million in cash at close of escrow and included a deferred purchase price agreement granting the Trust a percentage of the property's gross sales proceeds going forward.

16

the Beneficiary" pursuant to section 16463.[22]  In doing so, Suzan acted in accordance with Ziskin's directions by expressly consenting to the transactions relating to the proposed sale of Tower Grove "*as reflected in the documents enclosed with Kenneth A. Ziskin's memorandum to Hillel Chodos dated January 8, 2004*. [¶] Suzan Hughes confirms that she has been represented and advised by counsel *with regard to the terms of the transactions set forth above* and with regard to this consent."  (Italics added.)

At trial, Dickens himself confirmed exactly what the trial court found to be true: The transactions to which Suzan consented in writing differed from those to which the parties to the Tower Grove sale ultimately agreed.  Specifically, Dickens testified that the no-cash deal by which he acquired Tower Grove was a completely "different" deal than that the "$23,750,000 for purchase, all cash" deal to which Suzan gave her consent in exchange for $250,000 in consideration.  Further, during direct examination, Dickens agreed the difference between the two deals was "all cash versus no cash," and explained that, after telling Klein he did not have the means to pay a cash down payment, Klein told him, "we'll have to find a way to get you the property without any money down."

Based upon this record, we affirm the trial court's decision to reject appellants' affirmative defense of consent.  Simply put, Suzan provided written consent for a deal that never came to fruition.  Suzan did not, and never purported to, consent to the Tower Grove sale at issue here – to wit, the no-cash, seller-financed deal forming the basis of the trial court's decision to suspend and remove appellants.

Moreover, because we agree with the trial court that Suzan never consented to the relevant transaction – to wit, the Tower Grove sale – we need not delve into what appellants call an "issue of first impression":  whether for purposes of section 16463

---

[22]  Section 16463 provides in relevant part:
"(a) Except as provided in subdivisions (b) and (c), a beneficiary may not hold the trustee liable for an act or omission of the trustee as a breach of trust if the beneficiary consented to the act or omission before or at the time of the act or omission.
"(b) The consent of the beneficiary does not preclude the beneficiary from holding the trustee liable for a breach of trust in any of the following circumstances:
"[¶] . . . (2) Where the beneficiary at the time consent was given did not know of his or her rights and of the material facts (A) that the trustee knew or should have known and (B) that the trustee did not reasonably believe that the beneficiary knew."  (§ 16463, subds. (a), (b)(2).)

Alexander has the burden to disprove, or appellants have the burden to prove, valid consent.[23]

Nor must we enter the fray with respect to appellants' arguments regarding the relevance and admissibility of Exhibit 875, an email communication from Ziskin to Chodos, appellants, and others. This email, admitted at trial for the limited purpose of proving notice of its contents, attached "a memo re status on the Tower Grove sale" also prepared by Ziskin. Undisputedly, this email and attached memorandum were dated December 18, 2003, several weeks before Suzan was presented with and executed the relevant consent form. As such, this exhibit, even assuming for the sake of argument the trial court erred by restricting the scope of its admission, provides no basis for rethinking our conclusion that appellants' consent defense was properly rejected. As explained above, Suzan consented only to the transactions "reflected in the documents enclosed with Kenneth A Ziskin's memorandum to Hillel Chodos dated January 8, 2004." Accordingly, the documents enclosed with Ziskin's memorandum dated December 18, 2013 are beside the point.

And lastly, even if Suzan had consented to the Tower Grove sale, the fact remains that much of the conduct underlying the challenged order arose after the property sale was finalized when, for example, appellants took no action in response to Klein's imprudent decisions to forgive Dickens' multiple violations of the sale terms and to continue to extend him credit despite his obvious inability to repay. (Pp. 12-15.) As such, valid grounds nonetheless support the trial court's order to suspend and remove appellants given their breach of the duty to preserve trust assets following the Tower Grove sale.[24] (See *In re Marriage of Schmir, supra*, 134 Cal.App.4th at pp. 49-50 [the

---

[23] Specifically, appellants argue that section 16463, subdivision (a) places the burden on the trustee to prove consent was granted, while section 16463, subdivision (b) then shifts the burden to the beneficiary to prove the consent was invalid.

[24] Appellants argue there is no evidence that the trial court would have ordered their removal even if Suzan had consented to the Tower Grove sale. However, as explained above (pp. 6-7), appellants did not request a statement of decision from the trial court and, thus, cannot challenge its purported reasoning for ordering their removal: "[F]ailure to request a statement of decision results in a waiver of findings and conclusions necessary to support the judgment and we will accordingly infer such conclusions." (*Shaw v. County of Santa Cruz, supra,* 170 Cal.App.4th at p. 269.)

reviewing court must accept as true all evidence tending to establish the correctness of the trial court's findings and indulge all legitimate and reasonable inferences to uphold the judgment].)

## DISPOSITION

The order to suspend and remove appellants as Co-Trustees of the Mark Hughes Family Trust is affirmed. Appellants shall bear costs of the appeal.

_____

Jenkins, J.

We concur:

_____

McGuiness, P. J.

_____

Pollak, J.