Filed 1/8/16  Estate of Gilliland CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Estate of ELSINORE MACHRIS GILLILAND, Deceased. | B262482 |
| | (Los Angeles County Super. Ct. No. P517929) |
| HI-DESERT MEMORIAL HOSPITAL, INC. et al., Plaintiffs and Appellants, v. UNION BANK OF CALIFORNIA N.A., as Trustee, etc., Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael I. Levanas, Judge.  Affirmed.

Gordon & Rees, Douglas P. Smith and Stephanie Alexander; Young & Young and George W. Young for Plaintiffs and Appellants.

Quinn Emanuel Urquhart & Sullivan, Christopher Tayback and Michael Lifrak for Defendant and Respondent.

# I.  INTRODUCTION

Plaintiffs, Hi-Desert Memorial Hospital, Incorporated and The Salvation Army, appeal from a judgment following a bench trial.  Plaintiffs are charitable institutions who were beneficiaries of the Elsinore Machris Gilliland Trust (the trust).  Defendant, Union Bank of California, N.A., is the sole trustee.  The trust was modified on October 1, 2007, following a settlement agreement between the beneficiaries and defendant.  The modification order provided for distribution of trust assets to six charities, including plaintiffs.  The modification order was conditioned on obtaining a favorable Internal Revenue Service private letter ruling from the Internal Revenue Service.

On September 24, 2008, defendant received the Internal Revenue Service private letter ruling.  On October 2, 2008, defendant faxed a letter to the charities requesting they submit an authorization to distribute and wire instructions.  Plaintiffs eventually submitted their authorizations on November 12 and 14, 2008.  Between the time defendant received the Internal Revenue Service private letter ruling and when distribution occurred in December 2008, the trust assets had declined over $11 million.

Plaintiffs filed a petition to surcharge defendant for their losses.  Following trial, the probate court found in favor of defendant.  Plaintiffs assert the probate court erred by not finding defendant committed a per se breach of fiduciary duty.  Plaintiffs rely on the October 1, 2007 modification order's language that defendant "shall distribute . . . upon receipt" of the Internal Revenue Service private letter ruling.  Plaintiffs contend the "upon receipt" language required defendant to distribute the funds immediately.  Based upon the factual scenario before us, we disagree and affirm the judgment.

## II. BACKGROUND

### A. The Trust, Settlement Agreement and Surcharge Petition

Elsinore Machris Gilliland created the trust upon distribution of her probate estate in 1967. Several prior appellate decisions have discussed the trust or its beneficiaries. (See *Estate of Gilliland* (1971) 5 Cal.3d 56; *Union Bank of California v. Braille Inst. of America, Inc.* (2001) 92 Cal.App.4th 1324; *Estate of Gilliland* (1977) 73 Cal.App.3d 515; *Estate of Gilliland* (1974) 44 Cal.App.3d 32.) The trust document describes the trustee's powers of distribution as follows: "Upon any division or partial or final distribution of the Trust Estate, to partition, allot and distribute the Trust Estate in undivided interests, or in kind, or partly in money and partly in kind, at valuations determined by the Trustees, and to sell such property as the Trustees may deem necessary to make such division or distribution." The trust grants the trustees broad discretion in the exercise of their distribution powers. Paragraph 20 of the trust states: "Unless specifically limited, all discretions conferred upon the Trustees shall be absolute and their exercise conclusive on all persons interested in this Trust. The enumeration of certain powers of the Trustees shall not limit their general powers, the Trustees being vested with and having all the rights, powers and privileges which an absolute owner of the same property would have."

Defendant has been the sole trustee of the trust since March 2, 2001. The trust directs the trustee to pay $25,000 per year from the trust's net income to each of Ms. Gilliland's five nieces and nephews. Upon the nieces and nephews' death, the $25,000 distribution goes to their issue, if any, until the trust terminates upon the death of the last life in being. There are now three remaining family "lines" (the life annuitants) each of which receives $25,000 per year from the trust, for a total of $75,000 per year. The balance of the annual net income is distributed to six charities: the two plaintiffs; the American Heart Association; the Braille Institute of America, Incorporated; the Cancer Research Fund of The Damon Runyon-Walter Winchell Foundation; and The Midnight

3

Mission. The residue of the trust estate is distributable to the six charities after the death of the last life annuitant.

Between 1967 and 2006, the trust's corpus grew from around $16 million to approximately $72 million. As currently written, the trust's corpus would not have been distributed for approximately another 40 years. In 2006, the life annuitants and the charities entered into discussions to modify the trust to permit a substantial distribution of the unused corpus. The life annuitants and the charities ultimately reached an agreement. The agreement included augmentation of the life annuitants' annual income. This would be accomplished by the charities purchasing commercial annuities for the life annuitants' benefit. The agreement was subject to the Internal Revenue Service issuing a private letter ruling that the commercial annuities' value would not be presently taxable to the life annuitants. The Internal Revenue Service requested a court order modifying the trust before it would issue a private letter ruling. A petition to modify the trust was filed on April 6, 2007. The probate court ordered mediation.

On August 9, 2007, the charities, the life annuitants and defendant executed a settlement agreement. The settlement agreement provides for the distribution of all but $4 million of the trust corpus to the charities. Also, the August 9, 2007 settlement agreement requires the charities to purchase commercial annuities for the life annuitants. The charities will remain income beneficiaries to the extent the trust income exceeds $75,000 per year. The charities are remainder beneficiaries upon the trust's termination. The settlement is conditioned upon receipt of an Internal Revenue Service ruling that the commercial annuities would not be presently taxed as income and the generation skipping tax exemption remains. The probate court's October 1, 2007 trust modification order states in paragraph 10, "The Trustee shall distribute principal assets . . . upon receipt of such favorable Internal Revenue Service Private Letter Ruling." At the time of settlement, the trust's assets were invested in stocks and bonds and worth approximately $80 million. On October 1, 2007, the probate court approved the settlement and issued the modification order pursuant to Probate Code sections 15403 and 17200, subdivision

4

(b)(13). In November 2007, the second private letter ruling request was submitted to the Internal Revenue Service.

On September 17, 2008, the Internal Revenue Service delivered its favorable letter ruling, dated September 15, 2008. On September 24, 2008, the private letter ruling was delivered to defendant. As of September 30, 2008, the fair market value of the trust was $71,869,837.97, with over 95 percent of the trust's corpus invested in stocks and bonds. From November 12 to 18, 2008, the charities made an express written demand for liquidation and distribution pursuant to the probate court's order. Defendant proceeded to liquidate and distribute the trust's assets between November 19 and December 3, 2008. The value of the trust corpus had declined to $60,731,566.80 by this time. From the date of the Internal Revenue Service ruling until distribution to the charities, the trust corpus's fair market value declined by over $11 million.

On September 2, 2009, all of the charities except for The Midnight Mission filed a petition to surcharge defendant as trustee for the loss of the trust's corpus value. Plaintiffs allege defendant failed to follow the prudent investor rule and breached its fiduciary duties by its delay in distribution of the trust corpus after receiving the private letter ruling. In March and April of 2013, defendant settled with The American Heart Association, the Braille Institute of America, Incorporated, and the Cancer Research Fund of the Damon Runyon-Walter Winchell Foundation. The matter proceeded to a bench trial on May 13, 2013. On appeal, plaintiffs contest only defendant's alleged fiduciary duty breach by delaying the trust corpus distribution after receipt of the Internal Revenue Service private letter ruling.

B. Trial

1. Clark Byam's Testimony

Mr. Byam is an attorney with the law firm of Hahn & Hahn who represented the life annuitants. Mr. Byam was counsel responsible for seeking the Internal Revenue

5

Service private letter ruling. Mr. Byam could not guarantee a favorable Internal Revenue Service ruling. The requested ruling was complex and it was not clear what the outcome would be.

While working on the private letter ruling matter, Mr. Byam corresponded with William Poindexter. Mr. Poindexter represented three of the charities, the American Heart Association, the Braille Institute of America, and the Damon Runyon Cancer Research Fund. Mr. Byam considered Mr. Poindexter to be the "head" spokesperson for all the charities. Mr. Byam testified: "[Mr. Poindexter] instituted trying to revisit the issue of a modification of the trust in the 2000's. And he pretty much was the one that I dealt with. And he was the one who communicated on behalf of, I believe, not only those three charities, but I believe he also was the head spokesman for the other charities through their counsel. [¶] He was the one who seem to be -- I mean, just on the issues that we were dealing with, he was the one that we were going through, for the most part, to line up to get these annuities . . . and he was the one I negotiated with in resolving this when reaching our agreement." In their discussions, Mr. Poindexter had represented that he was in communication with counsel for the other charities.

2. Craig Braemer's Testimony

Mr. Braemer is a chartered financial analyst and certified financial planner. Mr. Braemer works for defendant. He was responsible for managing the trust's investments. He was unaware of the probate court's October 1, 2007 modification order. Mr. Braemer was unaware the private letter ruling had been issued in 2008 until after discussing it with Ronald Chaisson, the trust officer. Mr. Braemer was told on November 19, 2008, to liquidate the trust corpus of all but $4 million. Mr. Braemer was surprised the charities would take the distribution in-cash rather than in-kind. He thought the charities would choose in-kind based on the size of the trust and his prior experience with similar accounts and institutional beneficiaries. Mr. Braemer was able to liquidate the assets within a two-week period.

6

### 3. Mr. Chaisson's Testimony

Mr. Chaisson testified via his deposition. His testimony was actually read into the record before the probate court. Mr. Chaisson was employed by defendant from October 2000 to January 2011. He was a certified trust and financial advisor. He was the trust administrator from 2003 until he left in January 2011. Mr. Chaisson was the point of contact for defendant with the charities. Mr. Chaisson coordinated with Mr. Braemer regarding investments for the trust assets. Mr. Chaisson and Mr. Braemer decided the investment objective of the trust's portfolio. Mr. Braemer was responsible for the day-to-day investment decisions. The investment objective of the trust in 2007 was income and growth. Neither Mr. Chaisson nor anyone working for defendant made an attempt to assess when the Internal Revenue Service would issue its ruling. Mr. Chaisson became aware the Internal Revenue Service issued its favorable private letter ruling in September 2008. Mr. Chaisson relied upon Edmond Davis, one of defendants' attorneys, to monitor the status of the Internal Revenue Service ruling.

Mr. Chaisson did not know when the Internal Revenue Service would issue its private letter ruling. Immediately upon receiving the favorable Internal Revenue Service private letter ruling, Mr. Chaisson notified Mr. Braemer of its contents. They discussed whether the distribution should be: in-kind; in-cash; or partially in-kind and in-cash. Mr. Chaisson testified as to why the issue of how the distribution would proceed was discussed: "It[]s an industry standard that when individuals request to transfer assets amongst trustees, is a standard question right on the transfer form: Do you want it in cash, in kind, part in kind, part in cash? [¶] There was no discussion prior to this whether or not it was cash or in kind. So I told him -- our discussion was I was not aware what the charities want, that we -- I would pass that inquiry on to the attorney." The attorney representing defendant was Mr. Davis. The issue was passed to Mr. Davis to inquire with the charities as to how the distribution would proceed.

## 4.  Mr. Davis's Testimony

Mr. Davis's deposition testimony was received in evidence.  Mr. Davis was an attorney who specialized in trusts and estates.  He represented defendant regarding the trust since 1983.  Mr. Davis had interacted with Mr. Poindexter as to the modification of the trust.  Mr. Davis described Mr. Poindexter as a person who "most of the time was always in the middle of the activities" relating to the trust.  Mr. Davis testified, "[I]f [Mr. Poindexter] called and said we want to do something, I took that as meaning the charities wanted to do it."  Mr. Davis believed there was a possibility the Internal Revenue Service private letter ruling would be unfavorable.  He did not monitor the progress of the private letter ruling.  The Internal Revenue Service private letter ruling was issued on September 15, 2008.  Mr. Davis, who represents defendant, received the Internal Revenue Service private letter ruling via e-mail from Mr. Poindexter on September 24, 2008.  Mr. Davis did not know the Internal Revenue Service private letter ruling was coming.  Mr. Poindexter's e-mail indicated defendant should request from the charities instructions as to whether the annuities would be paid from the distributed trust assets.  Mr. Davis was in Turkey at the time the email was sent.  Mr. Davis did not recall what date he received Mr. Poindexter's email.  But as soon as he received the e-mail, he began working on the issue.  Mr. Davis prepared a draft letter in compliance with Mr. Poindexter's request as soon as possible.

On October 2, 2008, Mr. Davis' letter was sent by facsimile transmission to counsel for each charity.  Mr. Davis' letter requested the charities send an authorization to defendant to liquidate trust assets and provide wire instructions.  It is undisputed the charities received the October 2, 2008 letter.  Mr. Davis did not assume the charities would opt for the in-cash distribution.  Mr. Davis had no discussions with any of the charities' attorneys regarding distributions between the October 1, 2007 modification order and receiving the September 24, 2008 Internal Revenue Service private letter ruling.

8

On October 29, 2008, Mr. Poindexter sent a letter to Mr. Davis which stated: "Enclosed are authorizations from our three clients, American Heart Association, Braille Institute of America, Inc. and Damon Runyon Cancer Research Fund authorizing the bank to do two things. [¶] First, authorizing that the bank as trustee of the [trust] to liquidate distributable assets and distributor shares in cash. It is requested that the bank hold up on this requests. [sic] The charities are further reviewing whether they want all the distributable assets sold or some distributed in kind. We should be in a position to advise you further in regards to whether there would be some distribution in kind or all distributable assets liquidated. [¶] The second instruction from our clients is to pay the single premium for the three annuities being purchased . . . ." The attorneys for the other three charities were provided copies of Mr. Poindexter's October 29, 2008 letter via e-mail. Mr. Poindexter's October 29, 2008 letter is referred to as the "hold up" letter by the parties to the litigation. Mr. Poindexter's firm also sent the authorization from The Midnight Mission's attorney via facsimile transmission on October 29, 2008.

Mr. Davis received a letter dated November 12, 2008, from Doug Smith, attorney for The Salvation Army. Mr. Smith stated in the letter that The Salvation Army wanted its distribution in cash. Mr. Davis received another letter dated November 14, 2008, from George Young, an attorney for Hi-Desert Memorial Hospital. Mr. Young stated in his letter that the hospital also wanted the distribution to be in cash. Mr. Davis did not believe prior distribution instructions from Mr. Smith or Mr. Young had been sent to defendant. On November 18, 2008, Mr. Davis sent a facsimile transmission note to all of the charities' attorneys. The November 18, 2008 facsimile transmission note states in part: "Gentlemen: This will confirm that contrary to prior instructions that we may have received, all six of the charities represented respectively by you desire that the assets in the Trust be liquidated into cash except for the assets to be retained in the trust in accordance with the Court Order. You have instructed that the net cash proceeds from the liquidated assets are to be wire transferred, in equal shares, to the six charities, in accordance with wire instructions previously provided to us." Mr. Davis indicated in a subsequent November 20, 2008 facsimile transmission that liquidation and distribution

9

would not be completed until approximately December 1, 2008.  Mr. Davis made no inquiry regarding the probability of success for the private letter ruling.  Mr. Davis was not sure defendant needed authorization prior to distribution.  However, he considered it good practice to ask the charities.

### 5.  Stephanie Bezner's Testimony

Ms. Bezner is a lawyer representing The Midnight Mission.  Her practice involves estate planning.  In an e-mail dated September 19, 2008, Ms. Bezner wrote a letter to Mr. Adamson, The Midnight Mission's president.  In the September 19, 2008 e-mail, she wrote:  "I have asked Bill Poindexter, who has taken the lead with Union Bank, when we might expect to have the payments issued to the charities.  I will advise you of his response when I have received it."  Ms. Bezner felt Mr. Poindexter was coordinating responses from the charities' lawyers.

On October 13, 2008, Mr. Poindexter sent a letter to the other charities' attorneys.  The letter also included as an attachment, a form very similar to the one that Mr. Davis had sent out on October 2, 2008.  The letter stated:  "In addition there is another issue to be resolved.  Do you want the distribution in cash or in securities?  Our recommendation would be that we direct the bank to sell the securities so that distribution can be made in cash; this will greatly expedite the distribution.  Upon receiving the cash, it can be reinvest [sic] in any way desired.  [¶]  Please let me know if this is satisfactory to you.  As you will note, the enclosed form of instructions does include directions to sell assets and make distribution in cash (please change if distribution in kind is desired)."  Ms. Bezner sent a letter indicating her client's desire to opt for an in-cash distribution to Mr. Poindexter on October 24, 2008.  In the past, Mr. Poindexter would collect the responses for the charities.

On November 4, 2008, Mr. Poindexter sent a letter to Ms. Bezner, Mr. Young and Mr. Smith.  The letter indicated that if their respective clients desired an in-kind distribution for the bonds, the instructions to defendant would need to be corrected.

10

## C. Statement of Decision

The parties filed closing briefs. On November 24, 2014, the probate court adopted defendant's proposed statement of decision as its tentative ruling. On January 7, 2015, the probate court issued its final statement of decision. As noted, plaintiffs appeal the probate court's ruling only as to the period after defendant received the Internal Revenue Service private letter ruling.

The probate court ruled, and the parties agreed, that there was no opinion testimony regarding any potential fiduciary duty breach after defendant received the Internal Revenue Service private letter ruling. Rather, plaintiffs argued defendant committed a per se fiduciary duty breach by failing to promptly comply with the modification order. The probate court found: defendant did not commit a per se breach; defendant's October 2, 2008 facsimile transmission to the charities was reasonable; it was proper for defendant to inquire with the charities as to the form and destination of the distributions; and defendant had no duty to immediately and automatically distribute when the assets become distributable. In addition, the probate court found: it was reasonable for defendant to obey Mr. Poindexter's October 29, 2008 hold up letter; this was because Mr. Poindexter had a leadership role among the charities; plaintiffs were aware defendant was awaiting instructions because of Mr. Poindexter's September 24, 2008 e-mail and October 29, 2008 letter as well as Mr. Davis's October 2, 2008 facsimile transmission; the charities were considering whether to take the trust assets in cash or in kind; and the only instruction from any of the charities to defendant between October 2 and 29, 2008, was from Mr. Poindexter.

Even if defendant had breached its fiduciary duty to plaintiffs, the probate court found defendant's conduct was not the legal cause of any damage. The probate court found defendant could not be surcharged for any losses because market forces and plaintiffs' decision to liquidate caused the losses to occur. And the probate court found: defendant presented evidence it had managed the trust portfolio well during this period; plaintiffs were estopped from suing defendant for a surcharge; plaintiffs were barred from

11

the relief sought because of laches and waiver principles; and defendant had acted reasonably and in good faith and was excused from liability.

On March 18, 2015, the probate court entered judgment in defendant's favor.  This appeal followed.

## III.  DISCUSSION

Probate Code section 16000 provides:  "On acceptance of the trust, the trustee has a duty to administer the trust according to the trust instrument . . . ."  (See *Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 544.)  The Court of Appeal has held: "Trustees owe all beneficiaries . . . a fiduciary duty.  A fiduciary relationship is a recognized legal relationship such as trustee and beneficiary, principal and agent, or attorney and client.  [Citation.]  Where a fiduciary relationship exists, there is a duty '"to act with the utmost good faith for the benefit of the other party."'  [Citation.]"  (*Hearst v. Ganzi* (2006) 145 Cal.App.4th 1195, 1208; see *Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1160.)  A trustee's violation of any duty owed to beneficiaries is a breach of trust.  (Prob. Code, § 16400; *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 888.)  To establish a fiduciary duty breach, a plaintiff must show the existence of a fiduciary relationship, its breach and resulting legal damage.  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820; *LaMonte v. Sanwa Bank California* (1996) 45 Cal.App.4th 509, 517.)

Probate Code section 16440, subdivision (a) provides in relevant part, "If the trustee commits a breach of trust, the trustee is chargeable with . . . . [¶] . . . [a]ny loss or depreciation in value of the trust estate resulting from the breach of trust, with interest." (*Estate of Kampen* (2011) 201 Cal.App.4th 971, 989.)  Plaintiffs assert defendant committed a per se breach of fiduciary duty by failing to comply with the October 1, 2007 modification order and its trustee duties.  This presents a legal question which we review de novo.  (*Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439-1440 [trust language reviewed de novo without conflicting extrinsic evidence]; *Ike v. Doolittle*

12

(1998) 61 Cal.App.4th 51, 73.)  The probate court's resolution of disputed factual issues is affirmed if supported by substantial evidence.  (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632; *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

Plaintiffs assert under the plain language of the modification order and the trust, defendant should not have consulted with the charities about how they wanted their distribution.  Rather, defendant should have distributed immediately upon receiving the private letter ruling.  As noted, the modification order requires the trustee "shall distribute . . . upon receipt" of the favorable private letter ruling.  Probate Code section 21122 provides in relevant part, "The words of an instrument are to be given their ordinary and grammatical meaning unless the intention to use them in another sense is clear and their intended meaning can be ascertained."  "Receipt" is defined as the act or process of receiving.  (Merriam-Webster's 10th Collegiate Dict. (1993) p. 975.)  Plaintiffs assert "upon" means defendant should have distributed "immediately after," "on the occasion of," or "at the time of."  In Merriam-Webster's Tenth Collegiate Dictionary (1995) at page 1298, "upon" is defined as "on."  In this context, "on" context is defined as "used as a function word to indicate a time frame during which something takes place." (Merriam-Webster's 10th Collegiate Dict. (1995) p. 811.)  Thus, for purposes of the modification order, "upon receipt" would refer to when defendant received the private letter ruling.  "Upon receipt" is the triggering condition for when distribution shall occur. "Upon receipt" does not define how fast defendant "shall distribute."

We next address whether defendant breached its fiduciary duty as to how and when it distributed the trust assets.  It is prudent to seek guidance from the Restatement Third of Trusts.  The Court of Appeal has held:  "California trust law is essentially derived from the Restatement Second of Trusts.  Over a number of years, the Restatement Second of Trusts has been superseded by the Restatement Third of Trusts.  [Citation.]  As a result, we may look to the Restatement Third of Trusts for guidance."  (*Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 379, citing 13 Witkin, Summary of Cal. Law (10th ed. 2005) Trusts, §§ 12, 17, pp. 579-

13

580, 583-585.) Section 89 of the Restatement Third of Trusts discusses the trustee's powers and duties on termination of the trust. Though the trust here is not technically terminated as to all beneficiaries, distribution occurred for plaintiffs. Thus, section 89 of the Restatement Third of Trusts is persuasive authority here. The Restatement Third of Trusts, section 89, comment b provides in pertinent part, "[D]elay may result because of difficulties in establishing and implementing a plan for distributing the trust estate that both serves the interest of the beneficiaries and is consistent with the trustee's duty of impartiality." The Restatement Third of Trusts, section 89, comment e(2) provides in pertinent part: "[T]he mode or modes of distribution to be employed depend upon what the trustee, in the exercise of discretion, determines is in the interest of the beneficiaries and fair and reasonable under the circumstances. . . . [¶] Among the numerous factors that may be of significance to a trustee in developing an appropriate plan for the form and timing of distributions are: the nature of the trust subject matter . . .; the number of remainder beneficiaries and the size of their various shares; and the preferences, concerns, and circumstances . . . of the various distributees. . . . [¶] . . . [¶] Normally, a trustee should inform the distributees of the plan for distribution of the trust estate . . . . Especially if the plan is complicated, the trustee should consider obtaining the informed consent of the beneficiaries when it is practical to do so . . . ."

Based on the probate court's factual findings, supported by substantial evidence, defendant did not know when the Internal Revenue Service private letter ruling would arrive. Defendant received the Internal Revenue Service private letter ruling on September 24, 2008. Mr. Poindexter in his September 24, 2008 e-mail to defendant requested it draft instructions for the charities to fill out and return. Mr. Davis' letter was sent to plaintiffs on October 2, 2008. The October 2, 2008 letter requested authorization to distribute and wire instructions from plaintiffs in accordance with Mr. Poindexter's request. Mr. Byam, Mr. Davis and Ms. Bezner testified Mr. Poindexter had the leadership role amongst the charities' attorneys. Mr. Davis believed it to be good practice to seek instructions. He did not assume the charities wanted distribution in cash. As noted, the trustee is granted in paragraph 20 of the trust the absolute discretion to

14

make distributions. And defendant also had discretion to inquire from beneficiaries as to how to deliver the distribution. The Restatement Third of Trusts supports defendant's discretionary action. We cannot rule *as a matter of law* defendant breached its fiduciary duties by asking plaintiffs for distribution authorization and wire instructions within eight days of the triggering condition.

We also cannot rule *as a matter of law* that defendant committed a per se fiduciary duty breach by not distributing the proceeds until November 19, 2008. Substantial evidence supported the probate court's findings. Plaintiffs do not dispute receiving Mr. Davis's October 2, 2008 letter. Based on Mr. Poindexter's October 13 and November 4, 2008 letters to the other charities' counsel, whether to take the distribution in-kind or in-cash had not yet been resolved. Mr. Poindexter's October 29, 2008 hold up letter to defendant indicated that the matter of what kind of distribution to take had not yet been resolved by all the charities. As stated, Mr. Poindexter was considered to have a leadership role for all the charities. There is no evidence plaintiffs responded to Mr. Davis' October 2, 2008 letter until November 12 and 14. The defendant did not per se breach its fiduciary duties by commencing the distribution process on November 19, 2008, five days after receiving the last authorization letter. We need not address the parties' remaining arguments.

IV.  DISPOSITION


The March 18, 2015 judgment is affirmed.  Defendant, Union Bank of California, N.A., shall recover its appeal costs from plaintiffs, Hi-Desert Memorial Hospital, Incorporated and The Salvation Army.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P. J.


We concur:


KRIEGLER, J.


BAKER, J.